[Cite as *State v. Jordan*, 2019-Ohio-2647.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-18-1147

      Appellee                                      Trial Court No. CR0199506548

v.

Johnny Jordan                                      **DECISION AND JUDGMENT**

      Appellant                                     Decided:  June 28, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Kandra D. Roberts, for appellant.

* * * * *

**ZMUDA, J.**

## I.      Introduction

{¶ 1}  Appellant, Johnny Jordan, appeals the judgment of the Lucas County Court of Common Pleas, denying his motion for a new trial.  Because we find that the trial court did not abuse its discretion when it denied appellant's motion for new trial, we affirm.

## A.     Facts and Procedural Background

{¶ 2}   This appeal stems from appellant's 1996 conviction for rape, felonious sexual penetration, and felonious assault.  Appellant appealed his conviction, prompting our decision in *State v. Jordan*, 6th Dist. Lucas No. L-96-169, 1997 Ohio App. LEXIS 314 (Jan. 31, 1997).  In our decision, we set forth the relevant facts of this case as follows:

On September 20, 1995, appellant, the father of Lorraine, Mary and Nathaniel Jordan, was indicted on three counts of rape, three counts of felonious sexual penetration and three counts of felonious assault involving Lorraine, Mary and Nathaniel.  On March 11, 1996, a hearing was held in the trial court to determine whether appellant's nine-year-old daughter Mary Jordan was competent to testify at the trial.  At the conclusion of the hearing, the trial court found that Mary was competent to testify.  On March 25, 1996, the case came on for trial before a jury.  Prior to the beginning of testimony, the parties stipulated that neither Mary Jordan nor her sister Lorraine Jordan was the spouse of appellant.  The following relevant testimony was heard.

Diana Pudlicki, a caseworker for Lucas County Children Services (LCCSB), testified as to her contact with the Jordan family, which first occurred in October 1988 when Mary, Lorraine and Nathaniel were removed from their home for approximately six months following

2.

allegations of neglect and physical abuse. In November 1992, custody of Mary, Lorraine, Nathaniel and another brother was transferred to Lorrine Saunders, their paternal grandmother. On December 1, 1993, Lorraine was removed from her grandmother's home because she had been sexually acting out with her siblings and was placed in foster care. She testified further that the family's case with LCCSB was opened again in January 1993, when the agency received a referral alleging sexual abuse of Mary, Lorraine and Nathaniel.

Lorrine Saunders then testified that she had custody of Lorraine until December 1993 and that she still had custody of Mary and Nathaniel. Saunders stated that in the fall of 1993 Mary came to her and expressed problems relating to her father and that she and Mary discussed the concerns with a psychologist. Between November 1992 and November 1993, Mary told Saunders that she had been sexually abused more than once and that she took Mary for medical exams at least two times as a result of such disclosures. She testified further that when the children lived with her Mary and Lorraine walked to and from school and that there were many occasions when they arrived home late.

Mary Jordan, nine years old, testified that there were times when she would see her father as she walked home from Cherry School and that he would take her, her sister Lorraine and Dadie, another of her brothers, into

3.

his house, which was near the school.  Mary further testified that her father touched all of them "in our private parts."  Mary then stated that he touched her in her "private parts" and stated "right here * * * and in the back" and pointed between her legs.  She testified further that he put "his private" and "his fingers" in her vagina and "in the behind."  Mary stated that her father did the same thing to her brother and sister.  Mary then pulled her pant leg up to show a scar by her knee which she said she got from "* * * Daddy * * * with a knife."  She stated that he cut her with a knife "[a] whole bunch."  She stated that she also saw him do the same thing to Nathaniel and Lorraine.  Nathaniel then entered the courtroom and Mary identified a scar on his ankle and said "Daddy cut him" with a knife.

Lorraine Jordan, thirteen years old, testified that when appellant lived in the house near Cherry School he promised her money and if she would go into his house and that he touched her in her "private areas" and "did inappropriate stuff."  Lorraine testified further that appellant put his finger and penis in her vagina two or three times.

Linda Lewin, a clinical nurse specialist with the child abuse team at Medical College of Ohio, testified as to physical examinations she performed on Mary and Lorraine on December 21, 1993, following referrals for sexual abuse evaluation.  Lewin stated that she performed a genital exam on Mary, who was then seven years old, and that both genital

4.

and anal areas revealed normal findings. Lewin testified that it is possible that there would be no evidence of anal penetration two to four weeks after the act. Lewin stated that the exam did not confirm or deny that Mary had been sexually abused. Lewin testified further that she also performed a genital examination of Lorraine, then ten years old. Lewin stated that as a result of the exam it was her opinion that Lorraine had been sexually abused. She testified further that when she examined Lorraine the child told her that her father had touched her genitals "inside and outside" with his "private part." Lewin testified that Lorraine told her that it hurt when her father touched her.

At the conclusion of the trial, the jury found appellant guilty of one count of rape, two counts of felonious sexual penetration and three counts of felonious assault.

*Jordan*, *supra*, 6th Dist. Lucas No. L-96-169, 1997 Ohio App. LEXIS 314, *1-5.

{¶ 3} At sentencing on April 16, 1996, appellant was ordered to serve an indefinite prison term of 15 years to 80 years. On appeal to this court, appellant asserted that his convictions were against the manifest weight of the evidence. We thoroughly reviewed the evidence, and found that there was "substantial probative evidence presented" to support appellant's convictions. *Id.* at *7-8. Consequently, we affirmed the judgment of the trial court.

5.

{¶ 4} Approximately 20 years later, on October 5, 2016, appellant filed a motion for leave to file a delayed motion for new trial under Crim.R. 33(B). The motion was premised upon newly discovered evidence that was allegedly unavailable to appellant within 120 days of the original verdict. In the memorandum attached to his motion, appellant indicated that Mary and Lorraine recently recanted their testimony and now maintained that their father is innocent of the crimes for which he was convicted. According to appellant, Mary wrote him a letter in 2015 in which she informed him that she wanted to "do the right thing by telling the truth" and admitted that she had "lied as a young child and she wanted to right her wrongs."

{¶ 5} In support of his motion for leave, appellant attached several affidavits that were provided by his children. In the first affidavit, Mary stated:

> [On] November 19, 1992, [at] age 6, I was sent to live with my step-grandmother Lorrine Saunders by child protective services. While I was living with Lorrine Saunders she became very physically abusive to me and also coached me into saying my father sexually and physically abused me. I have never been to my father's apartment and I was never abused by my father Johnny Jordan * * *. My father Johnny Jordan is [an] innocent man that was made a victim. Both child protective services and the courts [were] aware of the abuse and coaching by Lorrine Saunders but [it] was ignored.

6.

**{¶ 6}** Similarly, in the second affidavit, Nathaniel provided:

[On] November 19, 1992, [at] age 6, I was sent to live with my step-grandmother Lorrine Saunders by child protective services. While living with Lorrine Saunders I was physically and mentally abused by her and I also witnessed Lorrine Saunders abusing, coaching and forcing my sister Mary Jordan into lying on my father Johnny Jordan * * * and other siblings of our family. I was also used in my father's conviction and my father has never [done] anything to harm myself or my siblings. Also child protective services and the courts [were] aware of the abuse and coaching by Lorrine Saunders.

**{¶ 7}** In addition to the affidavits provided by Mary and Nathaniel, appellant attached the affidavits of Akisha Jordan, John Wesley Jordan, and Johnnie Jordan, Jr. In Akisha's affidavit, she stated that she was placed with Lorrine Saunders as a teenager. Because she was older than the other children at the time of the placement, Akisha stated that she was "able to escape the abuse by running away." Akisha went on to state: "when my little sister and brother finally got the opportunity to talk to me they told me what had really happened. I know it was the truth because of what I went through in the short time living with Lorrine Saunders, [and I] also know they wouldn't lie about something like this." Akisha testified that she withheld this information because she was pregnant at the time and was "on the run from child protective services." She insisted that she, along

7.

with her siblings, had tried to tell the truth, but nobody was willing to listen. Ultimately, Akisha stated that appellant "has never done anything to harm [her] or [her] siblings."

{¶ 8} In John Wesley's affidavit, he testified, in relevant part:

Lorrine Saunders was very abusive to myself and my younger siblings in many ways. When I was placed with Lorrine Saunders I was physically, mentally and lied on (sic). Lorrine Saunders also made my little sister Mary Jordan lie on me and say I was sexually abusing her. I also walked to and from school every day with Mary Jordan, Lorraine Jordan, and Nathaniel Jordan and I [know] my father Johnny Jordan * * * did not do what he is accused of. We have never been to our father's apartment. But for some reason I was never brought back up and I never testified. How did that happen? Because it never happened. And I would have told the truth! I love my father and he has never done anything to harm myself or my siblings.

{¶ 9} Finally, Johnnie Jr. provided an affidavit in which he acknowledged that he did not "know much about what happened with [his] father." Despite this unfamiliarity, Johnnie Jr. testified that he knew that appellant would never commit the acts he was found guilty of committing, and he stated that his siblings were not untruthful in their recantations.

{¶ 10} On October 17, 2016, the state responded to appellant's motion for leave by filing a memorandum in opposition. In its memorandum, the state argued that the

8.

evidence relied upon by appellant in support of his motion was not newly discovered because appellant had previously discussed the possibility of evidence to support a motion for a new trial with the Ohio Public Defender's Office in 1997. The state supported its argument by referencing a May 2, 1997 letter from the Ohio Public Defender's Office, in which appellant was informed: "If your daughter [Akisha] has evidence that would show you are not guilty, we may be able to file a Motion for a New Trial. If you send her address to me, I can have an investigator go and talk to her about what she knows." The May 2, 1997 letter was attached to the state's memorandum in opposition. Because it was clear that appellant had discussed the possibility of a new trial with the Ohio Public Defender's Office, the state argued that he could not demonstrate that he was unavoidably prevented from discovering the evidence he cited in support of his present motion for new trial.

{¶ 11} Additionally, the state asserted that the affidavits attached to appellant's motion for new trial were not credible. In support of this assertion, the state points to the fact that Akisha acknowledged in her affidavit that she had no personal knowledge of the facts and circumstances surrounding this case, but instead relied upon inadmissible hearsay to form her conclusions. Likewise, the state noted that Johnnie Jr. had no personal knowledge of the facts of this case. Moreover, the state highlighted the similar wording used in all of the affidavits, and surmised that the affidavits were not written by the affiants, but were instead drafted by one person. Finally, the state urged that the

9.

affidavits contradicted the evidence introduced at trial with respect to appellant's physical abuse of Mary and sexual abuse of Lorraine.

{¶ 12} On February 7, 2017, appellant filed his motion for new trial, in which he advanced the same arguments that were made in support of his motion for leave.[1] Appellant attached the affidavits referenced above, as well as additional affidavits from Mary and Lorraine that set forth the details behind their recantations. In Mary's additional affidavits, she testified that she

> felt pressured into testifying by my grandmother and by children services. I was pressured to lie that my dad had abused me and my siblings with the threat of emotional and physical abuse in my grandmother's home. I had been abused before my dad's trial and I was frightened that I would be abused again if I did not say that my dad had abused us. I remember even being promised money and ice cream to go to the trial and tell the story that my dad had abused us.

{¶ 13} Similarly, in Lorraine's additional affidavit, she stated: "I was pressured into testifying falsely against my father as a child. My siblings and I were mentally and

---

[1] At the time of appellant's filing of his motion for new trial, the trial court had not yet ruled on appellant's motion for leave to file the motion for new trial. As set forth infra, the trial court granted appellant leave to file the motion for new trial in its May 29, 2018 order denying the motion.

10.

physically abused in my grandmother's home. I was terrified of what the repercussions would be if I did not tell the lies my grandmother wanted me to tell about my father."

{¶ 14} On March 17, 2017, the state filed a response to appellant's motion for new trial, in which it indicated that the "matter has been resolved by agreement of the parties" and therefore did not formally oppose the motion. In its response, the state reserved the right to file an opposition to appellant's motion for new trial in the event that appellant failed to comply with the terms of the agreement. The agreement between the parties did not materialize for reasons that are not made clear by the record. Consequently, the parties agreed to an evidentiary hearing on appellant's motion for leave to file a delayed motion for new trial and motion for new trial. The state did not file an opposition to appellant's motion prior to the hearing.

{¶ 15} On October 30, 2017, the trial court held the aforementioned evidentiary hearing on appellant's motions. Six witnesses testified at the hearing. The first witness, Dr. Naeem Khan, is a clinical psychologist who was retained by appellant to perform a psychological evaluation. During his testimony, Khan stated that he met with appellant on two separate occasions, for a total period of about five hours. As a result of observations drawn from appellant during the meetings, Khan authored a report that was admitted into evidence, in which he concluded that appellant was intellectually disabled, mentally ill, and physically frail.

{¶ 16} Following Khan's testimony, Lorrine was called out of order by the state as the second witness. Lorrine testified that she received custody of Nathaniel, John

11.

Wesley, Lorraine, and Mary in November of 1992. She went on to explain oddities in Mary's behavior that she first noticed in the summer of 1993. According to Lorrine, Mary began to act as though she was "sore in her private parts." Lorrine explored the issue with Mary, and Mary informed Lorrine that Lorraine "had hurt her down there with her hand." Upon learning this, Lorrine notified the children's counselor, who informed Children's Services about the situation. The counselor conducted one-on-one interviews with the children. Ultimately, Children's Services moved Lorraine from Lorrine's home on December 1, 1993, over two years prior to appellant's trial. Lorraine did not return to Lorrine's home. According to Lorrine, Children Services removed Lorraine from the home for two reasons: (1) due to inappropriate contact with Mary; and (2) in order "to keep her away from her father."

{¶ 17} During her testimony at the evidentiary hearing on appellant's motion for new trial, Lorrine denied the allegations that she coerced Mary and Lorraine into falsely accusing appellant of sexually molesting them. According to Lorrine, Mary and Lorraine asked her what they should say at trial, and she directed them to "tell the truth, that's all you can do is tell the truth." When asked if Mary and Lorraine ever informed her that they had falsely accused appellant of sexual molestation, Lorrine responded: "no, they never said to me that they had lied about anything."

{¶ 18} At the close of her testimony, Lorrine recalled a conversation with Lorraine from earlier in 2017, during which Lorraine informed Lorrine that she was "saying the things that they said about me * * * to help Mary get the father out." Lorrine went on to

12.

state that Lorraine and Nathaniel each informed her that appellant would be filing a lawsuit when he was released from prison.

{¶ 19} Mary was the third witness to testify at the evidentiary hearing. For her part, Mary recanted the testimony she previously provided as a child in appellant's 1996 trial. Specifically, Mary stated that she was not sexually or physically abused by appellant as a child, and she indicated that she did not observe any physical abuse from appellant directed at Nathaniel. When asked why she provided incriminating testimony as a child, Mary answered: "Because that's what [Lorrine] told us. And well, with the scars * * *. Um, so that's where I got the scars from, because she told us that every scar that we had, our mother and father did." Mary went on to state that Lorrine routinely employed physical discipline. According to Mary, Lorrine forced her and her siblings to claim that they were being molested by one another. Mary recounted one particular instance in which Lorrine allegedly forced her to make a false accusation against Lorraine, as follows:

> Um, one day, um, I came in and I went to the bathroom. I was sitting on the toilet. The door was open because we didn't close [the] bathroom [door] – I don't know if the bathroom door was closed, but I know [Lorrine] walked in. And as she was walking in, I was looking in the toilet. I had just got done doing number two and I was curious.
>
> I was looking in the toilet and she [was] like Lorraine been sticking her finger in there da, da, da. And I'm like, no. Lorraine, I knew she did, I

13.

know she did.  You better tell me.  I know Lorraine been touching you.
Where she touch you at?  And I told her, okay, yes, she touched me.  She
touched me in a bad house.  I came up with something.  You had to keep us
with the lies because the lies [were] going so easily in that house.  You had
no choice but to lie.

{¶ 20} When asked whether the counseling she received as a child was precipitated by her claim that she was molested by appellant, Mary indicated that she "never claimed my father had touched me."  Mary testified that Lorrine told her and Lorraine that appellant molested them, and then coached them to testify to that fact.

{¶ 21} According to her hearing testimony, Mary informed authorities of appellant's innocence following her emancipation.  Mary testified that her reports were not taken seriously by the police.  Eventually, in May 2015, Mary received a letter from the Parole Board stating that appellant was scheduled for a parole hearing in September 2015.  In response to the letter, Mary contacted the Parole Board and informed the board that she was "coached and abused through this whole situation and my father is an innocent man and always has been."  Mary then prepared affidavits on behalf of herself and her siblings, and submitted those affidavits to the parole board after her siblings signed them.  Mary clarified that Lorraine prepared her own affidavit.  Ultimately, a hearing before the Parole Board was held, and appellant was subsequently released on parole.

14.

{¶ 22} At the conclusion of direct examination, appellant's counsel asked Mary if she was recanting her testimony in order to pursue damages from a civil lawsuit, to which Mary responded:

> No, I'm not. My main thing is to get the truth out, not just my father just being outside walking around, but my father did not commit these crimes. He deserve[s] to be walking around here not being labeled as a sex offender.
>
> And, yes, if you want to know if I plan on suing people, if I have any opportunity after this, I do. But it's all about the truth.

{¶ 23} On cross examination, the state questioned Mary regarding the testimony she provided at appellant's trial. Specifically, the state asked Mary about her testimony that appellant had cut her with a butcher knife, which left scars on her legs. Mary insisted that appellant did not cause the scars, and stated that her "whole testimony was a lie." When pressed further about how she received the scars, Mary stated that she did not know what caused the scars.

{¶ 24} The state then explored Mary's testimony that Lorraine had touched her and it hurt, which was supported by a report from Mary's counselor. In the report, the counselor indicated that Mary told her that Lorraine "climbs into Mary's bed, takes off her underwear and simulates intercourse and also sticks her finger in Mary's vagina." Mary stated that this report was a lie prompted by Lorrine.

15.

{¶ 25} In response to Mary's claim that her prior testimony was the product of coercion from Lorrine, the state asked Mary why she did not recant her testimony once she was removed from Lorrine's care. Mary responded that she attempted to inform the police of her untruthful testimony, but nobody would listen to her. No police reports were filed to support Mary's assertion.

{¶ 26} Lorraine was the fourth witness to testify at the evidentiary hearing. As of the date of the hearing, Lorraine had not seen appellant since his trial. Lorraine testified that appellant was innocent of the charges for which he was convicted. She stated that she informed the Parole Board of appellant's innocence in 2015, prompting appellant's release from prison.

{¶ 27} Regarding her childhood, Lorraine testified that she was removed from her parents' care and placed in various foster homes prior to being placed with Lorrine. Lorraine indicated that she was molested while in foster care. Lorraine also acknowledged that she would molest other children while she was in foster care.

{¶ 28} When Lorraine was approximately ten years old, she moved into Lorrine's home along with Mary, Nathaniel, and John Welsey. Lorraine described the living conditions at Lorrine's home as "torture." She explained that Lorrine would beat her with extension cords and belts until she acknowledged seeing appellant. When pressed further as to why she and her siblings were being beaten by Lorrine, Lorraine stated: "Because we [were not] listening to what she was saying. She wanted us to say that my dad molested me. We refused to say it."

16.

{¶ 29} Consequently, Lorraine attempted to run away from home on a number of occasions. According to Lorraine's hearing testimony, she attempted to set fire to Lorrine's home, and was consequently removed from the home prior to appellant's trial. After moving out of Lorrine's home, Lorraine was placed in a group home. She subsequently lost contact with Lorrine and her siblings.

{¶ 30} On the day of appellant's trial, Lorraine was reportedly transported to the court by a stranger, who coached her to testify against appellant. Lorraine also testified that her "teacher parents" in the group home encouraged her to testify against appellant so that she could be adopted. Further, Lorraine explained that Lorrine and Children's Services contrived her testimony and manipulated her into making false allegations against appellant at his trial. Motivated by a desire to be adopted, Lorraine testified at the hearing that she fabricated her testimony at trial.

{¶ 31} At the conclusion of appellant's direct examination of Lorraine, counsel asked Lorraine whether she was "hoping to cash in on this and make any money off of this." Lorraine responded:

> I mean if I could, I sure would, but no. I want my daddy to get his
> life back. I want him to walk around. I don't want him having that child
> molestation on him everywhere he [goes] because I know you all put the –
> you know, you go to jail for molestation, everywhere you move, everybody
> [knows]."

17.

{¶ 32} The fifth witness to testify at the evidentiary hearing was Kristine Buffington. Working as a clinical therapist at the time of appellant's trial, Buffington interviewed Lorraine, Mary, John Wesley, Nathaniel, and Lorrine in June 1993, and treated the children's mental health issues on an ongoing basis thereafter. At the time of the interview, Lorraine reported that appellant sexually abused her by simulating intercourse and rubbing his penis on top of her vagina. Throughout the treatment process, the children made no mention that they were being forced by Lorrine to falsely accuse appellant of molestation, nor did they report Lorrine for physical or emotional abuse. Buffington explained that she would normally separate the children from Lorrine during the treatment sessions.

{¶ 33} The sixth and final witness at the hearing was Laura Calvin. Calvin was the Lucas County Children's Services caseworker assigned to the children in June 1993 after the agency received reports of sexual acts taking place among the children. During her investigation into the reports of sexual acts, Calvin interviewed Lorraine, Mary, John Wesley, and Nathaniel. According to a memorandum prepared by Calvin prior to appellant's trial, and admitted at the evidentiary hearing, Mary informed Calvin that "Lorraine does nasty stuff – comes to my bed and pulls up our nightgowns. She gets on top and pushes down hard with her private, not touching with fingers." Mary went on to indicate that others, including appellant, had committed similar acts. Lorraine admitted to the sexual acts described by Mary, and informed Calvin that appellant "did it to me: Get on top, didn't do anything, pull pants down, but I don't know!" At the hearing,

18.

Calvin responded in the negative when she was asked whether the children reported that they were being coerced into telling lies about appellant.

{¶ 34} Following the hearing, the parties submitted post hearing briefs. On May 29, 2018, the trial court issued its decision. In its decision, the trial court articulated the standard governing a motion for new trial under Crim.R. 33, and specifically applied that standard in the context of new evidence generated by recantations. The trial court examined the evidence generated at the evidentiary hearing and found that the testimony provided by Mary and Lorraine was not credible, and thus their recantations not believable. The trial court characterized the testimony as "uncorroborated, inconsistent with the record, belied by [Mary and Lorraine's] actions and conduct over the years preceding their testimony before the parole board, and motivated by a desire for financial gain from a lawsuit." By contrast, the trial court found Lorrine's testimony credible. As a result, the trial court granted appellant's motion for leave to file a delayed motion for new trial, but denied appellant's motion for new trial.

## B. Assignments of Error

{¶ 35} Following the trial court's denial of his motion for new trial, appellant filed a timely notice of appeal, and now assigns the following errors for our review:

FIRST ASSIGNMENT OF ERROR: The trial court abused its discretion in failing to consider the entire record in denying a motion for new trial.

19.

SECOND ASSIGNMENT OF ERROR: The trial court erred in failing to consider whether there was a strong probability that the new evidence would change the result of a new trial.

## II.    Analysis

{¶ 36} "A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus. An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 37} A motion for new trial under Crim.R. 33(B) may be premised upon the discovery of newly-discovered evidence. Crim.R. 33(A)(6). To grant a new trial based upon newly-discovered evidence,

> it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

20.

**{¶ 38}** Here, appellant's motion for new trial is premised upon the fact that Mary and Lorraine have recanted their trial testimony and now assert that appellant did not sexually abuse them when they were children. "[N]ewly discovered evidence which purportedly recants trial testimony is 'looked upon with the utmost suspicion and must be viewed with strict scrutiny.'" *State v. Haynes*, 11th Dist. Ashtabula No. 2012-A-0032, 2013-Ohio-2401, ¶ 70, quoting *State v. Bradley*, 101 Ohio App.3d 752, 758-759, 656 N.E.2d 721 (8th Dist.1995). Thus, "evidence that a key witness for the prosecution gave false testimony at trial does not automatically warrant a new trial." *State v. Beckett*, 6th Dist. Lucas Nos. L-97-1073 and L-98-1272, 2000 Ohio App. LEXIS 732, *21 (Mar. 3, 2000), citing *Bradley* at 758. However, such evidence may constitute grounds for a new trial if it creates a strong probability that the outcome of the trial would have been different. *Id.*, citing *Dayton v. Martin*, 43 Ohio App. 3d 87, 90, 539 N.E.2d 646 (2d Dist.1987).

**{¶ 39}** A two-step analysis is applied to cases where significant witnesses recant their trial testimony. *Toledo v. Easterling*, 26 Ohio App.3d 59, 498 N.E.2d 198 (6th Dist.1985), paragraph three of the syllabus. First, the trial court must determine which version of the contradictory testimony offered by the recanting witness is credible and true, and whether the recanted testimony is to be believed. *Id.* "Some relevant considerations in weighing the competing versions of testimony are: whether the judge reviewing the new trial motion also presided over the trial; whether the witness is a relative of the defendant or otherwise interested in his success; and whether the new

21.

testimony contradicts evidence proffered by the defense at trial." *State v. Wright*, 7th Dist. Harrison No. 11 HA 2, 2011-Ohio-5761, ¶19 (citation omitted). Second, the trial court must evaluate whether the witness's testimony could have affected the outcome of the trial. *Easterling* at paragraph three of the syllabus.

**{¶ 40}** In appellant's first assignment of error, he argues that the trial court erred in failing to consider the entire record prior to denying the motion for new trial.

**{¶ 41}** In its opinion and judgment entry, the trial court does not set forth its own summary of the evidence produced at trial. Instead, the trial court quotes our summary of the evidence from *Jordan*, *supra*, 6th Dist. Lucas No. L-96-169, 1997 Ohio App. LEXIS 314.

**{¶ 42}** Looking only to the trial testimony portion of the trial court's entry, it may appear that the court simply relied upon our summation of the facts rather than independently reviewing the trial record. However, as noted by the court elsewhere in its entry, the judge that reviewed appellant's motion for new trial also presided over appellant's trial, and was therefore familiar with the facts of this case. Additionally, the state referred to the trial transcript during its questioning of witnesses at the evidentiary hearing. Moreover, the trial court referenced certain portions of the trial testimony in its analysis. For example, the court stated in its entry that "Mary's testimony at the hearing, and in an affidavit, that her grandmother coached her is contradicted by the trial transcript. At the trial she testified that she asked [Lorrine] to help her prepare for her testimony." The court also referred to Lorraine's trial testimony in its decision.

22.

{¶ 43} Appellant asserts that the trial court failed to consider inconsistencies in the trial record, arguing that the state's trial evidence was "not strong." The trial record belies appellant's characterization of the trial evidence. Indeed, Mary testified at trial that appellant penetrated her vagina and buttocks with his finger and penis. Similarly, Lorraine testified that appellant penetrated her vagina with his finger and penis. Moreover, Mary testified that appellant had cut her leg with a knife, which was supported by a scar that was observed at trial.

{¶ 44} Next, appellant argues that the trial court acted unreasonably when it found that Mary and Lorraine were not credible witnesses because their recantations were motivated by the possibility of financial gain. Specifically, appellant contends that the trial court's credibility determination was the product of "undue and misguided emphasis" on Lorrine's testimony, in which Lorrine indicated that she had heard from Lorraine and Nathaniel that they were saying things about her to help Mary get appellant out of prison so that he could file a lawsuit seeking money damages.

{¶ 45} As to the trial court's credibility determination, we are mindful that such determinations are primarily for the trial court as the trier of fact in this case. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). This is because the trial court was best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. From its unique

23.

vantage point, the trial court is able to take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 46} Taking these principles into consideration, we find no indication in the record that the trial court's credibility determination should be overturned. Even after discounting the value of Lorrine's testimony as to the motivation behind Mary and Lorraine's testimony, both Mary and Lorraine acknowledged that they would pursue a lawsuit if possible. Indeed, Mary testified concerning the potential of a lawsuit and stated: "And, yes, if you want to know if I plan on suing people, if I have any opportunity after this, I do." Therefore, we find no merit to appellant's argument that the trial court relied exclusively on Lorrine's testimony when concluding that Mary and Lorraine were recanting in order to pursue a lawsuit.

{¶ 47} In light of the trial court's reference to the record throughout the analysis section of its opinion and judgment entry denying appellant's motion for new trial, and mindful of the fact that the judge who denied appellant's motion is the same judge who presided over appellant's trial, we find no merit to appellant's assertion that the trial court failed to examine the entire record before it issued its decision denying the motion for new trial. Accordingly, appellant's first assignment of error is not well-taken.

{¶ 48} In his second assignment of error, appellant contends that the trial court failed to consider whether there was a strong probability that the new evidence would

24.

change the result of a new trial. In his argument, appellant cites the appropriate two-step analysis from our decision in *Easterling*. As noted above, the second step of the analysis requires a trial court to evaluate whether the witness's testimony could have affected the outcome of the trial. Importantly, however, the second step of the analysis only applies when the trial court has first determined that the recanted testimony is to be believed. Stated differently, "If the trial court is satisfied that the trial testimony is true, it need not proceed to the second question to determine the probability that the new evidence will change the original result." *State v. Fuson*, 5th Dist. Knox No. 03CA11, 2004-Ohio-2490, ¶ 12, citing *Easterling*, *supra*, 26 Ohio App.3d at paragraph three of the syllabus, 498 N.E.2d 198. Having already concluded that the trial court did not abuse its discretion in concluding that the recanting witnesses were not credible, we find no error in the trial court's failure to address whether the new evidence would change the result of a new trial.

{¶ 49} Accordingly, appellant's second assignment of error is not well-taken.

### III.        Conclusion

{¶ 50} Having found appellant's assignments of error not well-taken, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.       _____

                                                    JUDGE

Christine E. Mayle, P.J.

                                _____

Gene A. Zmuda, J.                                     JUDGE
CONCUR.

                                 _____

                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.