[Cite as *State v. Ibrahim*, 2020-Ohio-3425.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 17AP-557 |
| | | (C.P.C. No. 12CR-509) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Mohamed A. Ibrahim, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 23, 2020

**On brief**: *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief**: *Alan D. Gabel*, for appellant. **Argued:** *Alan D. Gabel*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Mohamed A. Ibrahim, from a judgment of the Franklin County Court of Common Pleas denying his petition for post-conviction relief and motion for a new trial.

{¶ 2} We initially summarize the underlying facts and procedural history of this case as set forth in two prior decisions of this court, *State v. Ibrahim*, 10th Dist. No. 13AP-167, 2014-Ohio-666 ("*Ibrahim I*"), involving appellant's direct appeal of his convictions, and *State v. Ibrahim*, 10th Dist. No. 14AP-355, 2014-Ohio-5307 ("*Ibrahim II*"), in which appellant appealed the trial court's judgment denying a hearing on his petition for post-conviction relief. On January 31, 2012, appellant and a co-defendant, Mohamed M. Noor, were charged in a 47-count indictment for aggravated burglary, felonious assault, kidnapping, aggravated robbery, as well as attendant firearm specifications.

{¶ 3} The indictment arose out of a "home invasion" at the residence of Farheyo Abdulkar ("Farheyo"). *Ibrahim II* at ¶ 2. On January 21, 2012, "a number of Somali friends and acquaintances were gathered at an apartment located at 3740 Eakin Road." *Ibrahim I* at ¶ 2. Shortly after midnight, appellant and Noor "forcefully entered the apartment wearing masks." *Id.* Appellant "was armed with a handgun," and "[t]he intruders ordered the occupants of the apartment to the floor and began to rob them of their wallets, cell phones, and other belongings." *Id.* Appellant and Noor "trashed the apartment and terrorized the occupants by kicking them, putting the gun against their heads, and threatening their lives for approximately 30 minutes." *Id.*

{¶ 4} During the incident, appellant "pistol-whipped one victim in the head," injuring that person and causing the weapon to discharge, the bullet striking "another victim in the stomach." *Ibrahim I* at ¶ 3. After the weapon discharged, "the situation changed and the occupants of the apartment rose up against the intruders, disarmed appellant, and beat appellant and the co-defendant with punches, kicks, and blows from a baseball bat." *Id.* The shooting victim "escaped the apartment through a small window in the bathroom," and "placed one of the 911 calls that brought police and medics to the scene to neutralize the situation and tend to the injured." *Id.*

{¶ 5} In January 2013, the matter came for trial before a jury. Following the presentation of evidence, the jury returned verdicts finding appellant guilty of 1 count of aggravated burglary, 2 counts of felonious assault, 11 counts of kidnapping, and 11 counts of aggravated robbery, all with accompanying firearm specifications. By judgment entry filed February 1, 2013, the trial court sentenced appellant to 57 years of incarceration. Noor "was convicted of the same, as well as having a weapon under disability," and the trial court sentenced Noor to a total of 65 years in prison. *Ibrahim II* at ¶ 2.

{¶ 6} Appellant appealed his convictions, raising two assignments of error in which he asserted: (1) the interpreter utilized by the prosecutor was not qualified, and (2) the trial court abused its discretion in sentencing him to a 57-year term of incarceration. In *Ibrahim I,* this court overruled both assignments of error and affirmed the judgment of the trial court.

{¶ 7} On November 12, 2013, appellant filed a petition for post-conviction relief, pursuant to R.C. 2953.21(C), asserting the trial court erred in failing to grant him a hearing

on his petition.  In *Ibrahim II,* this court affirmed in part and reversed in part the judgment of the trial court.  In conducting our review, we affirmed the trial court's denial of the petition "on grounds of ineffective assistance of trial counsel for failure to secure footage from security cameras." *Ibrahim II* at ¶ 22.  This court also found the trial court did not err in failing to hold a hearing to determine the credibility of six affiants, i.e., Fatima Yussuf, Hussein Ibrahim, Luuley Mohamed, Mohamed Bukdow, Abdullah Aboke, and Marian Mohamed.

{¶ 8}    This court next considered the affidavits of three other individuals, Amina Manguera, Mowlina Aboke, and Aweis Ibrahim.  We noted that appellant had offered the affidavits of these individuals "in support of his claims that trial counsel was ineffective for failing to investigate, subpoena witnesses, and question witnesses regarding * * * information [t]hat alleged victim Abdi Mohamed bragged that a robbery did not occur," that "another prosecuting witness stated that a robbery did not occur," and "the prosecuting witnesses attempted to extort $10,000 from appellant's family in exchange for their silence at the trial." *Ibrahim II* at ¶ 26.

{¶ 9}    Manguera, appellant's aunt, averred in an affidavit "that she personally spoke with one of the alleged victims, who informed her that appellant had seen * * * drugs and money in the apartment and, therefore, they beat him and made up the robbery story because they were afraid he would reveal their secret." *Ibrahim II* at ¶ 27.  Manguera also "averred that the alleged victim told her that no robbery had occurred and that, if the family of appellant would give the group $10,000, they would remain silent and make the case go away." *Id.*

{¶ 10}  Aweis Ibrahim ("Aweis"), the brother of appellant, stated in his affidavit that "he was personally aware that Abdi Mohamed had been bragging at Star Coffee that he beat appellant, the member of another Somalian tribe, and put him in jail." *Ibrahim II* at ¶ 28.  Aweis "further averred that Somalilander witnesses approached his family attempting to extort $10,000 in exchange for their silence at appellant's trial." *Id.*  Aweis also "indicated that he personally heard prosecuting witness Farheyo indicate that she wanted appellant to keep his mouth shut concerning her drug operation." *Id.*

{¶ 11} Mowlina Aboke, the owner of a barbershop, averred that "prosecuting witness Abdi Mohamed came into his barbershop" and told him "that there had been no

robbery and that the robbery had been falsely reported to protect themselves from appellant after he saw the drugs in the apartment." *Ibrahim II* at ¶ 29. Aboke also averred in his affidavit "that Abdi Mohamed told him that he and the prosecuting witnesses had offered appellant's family $10,000 'to make the case go away.' " *Id.* This court deemed certain averments by Aboke "to be speculation." *Id.* This court found, however, that Aboke's "apparent disinterest, and the fact that his other averments were consistent with those of Manguera, Aweis, and appellant, lend credibility to their averments." *Id.*

{¶ 12} This court also determined that "exhibit No. 15, a purported jail visitor list showing that two of the prosecuting witnesses, Farheyo Abdulkar and Abdi Aden, attempted to visit appellant in jail," also lent "credibility to the averments of Mowlina [Aboke], Manguera, Aweis and appellant." *Ibrahim II* at ¶ 30. With respect to claims of an "alleged extortion attempt," raised in the affidavits of Manguera and Aboke, this court found "[t]he fact that these specific averments of the affiants are not rebutted by any of the evidence presented at trial also lends credibility to these affiants." *Id.*

{¶ 13} In considering the above issues, this court held in part:

> The trial court did not address appellant's extortion claims, nor the purported jail visitor list. The state likewise did not address the jail visitor list and, as to the extortion claims, only argued that the claim is unpersuasive and not credible.
>
> Taking all of this into consideration, we find that the jail visitor list, along with the consistent averments of the witnesses summarized above, most particularly those of Mowlina [Aboke], together set forth sufficient operative facts, which, if believed, would establish substantive grounds that trial counsel had substantially violated at least one of a defense attorney's essential duties to his client. We also find that, if believed, these averments could implicate all of the state's prosecuting witnesses (victims stated no robbery actually occurred; victims tried to extort money for their silence). Such implication of all the prosecuting witnesses could have resulted in a different outcome at trial, thereby prejudicing appellant. Therefore, we find the trial court erred in not holding a hearing to determine the credibility of the affiants as to these averments.

*Ibrahim II* at ¶ 32-33.

{¶ 14} This court thus affirmed in part and reversed in part the judgment of the trial court and remanded for further proceedings. On remand, the trial court conducted

evidentiary hearings on October 4, 2016, March 6 and May 22, 2017, during which appellant testified on his own behalf and presented the testimony of his brother, Aweis Ibrahim, his aunt, Amina Manguera, and Mowlina Aboke. Plaintiff-appellee, State of Ohio, presented the testimony of appellant's trial counsel, Jeffrey M. Basnett, and Trevor M. Clark, assistant chief counsel for the Ohio Department of Rehabilitation and Correction ("ODRC"). On May 1, 2017, appellant filed a motion for new trial. On July 19, 2017, the trial court filed a decision and entry denying appellant's petition for post-conviction relief and motion for new trial (hereafter "July 19, 2017 Decision"). Also on July 19, 2017, the court issued a "decision on post-trial motions" (hereafter "July 19, 2017 Decision on Post-Trial Mot.").

{¶ 15} In its decision and entry denying the petition, the trial court rendered the following findings of fact based on the evidence presented at the evidentiary hearing following remand. Appellant's brother, Aweis, testified "he was not present when the offenses occurred." Aweis testified that Abdi Mohamed, the owner of a coffee shop, "bragged about beating up [appellant] and putting him in jail for life." (July 19, 2017 Decision at 2.) Aweis "also testified that his uncle, Abdulkadir Aden, 'a couple of guys,' 'the lady that owned the place,' and 'one of the guy[s]' asked for $10,000 to not appear for trial." (July 19, 2017 Decision at 2-3.) In his affidavit, Aweis "averred that 'Somalilander witnesses' made these purported statements." (July 19, 2017 Decision at 3.)

{¶ 16} Aweis stated "he was aware of the alleged extortion attempt before [appellant's] trial began * * * but never provided this information to [appellant's] trial attorney." Aweis "never came to court during the week-long jury trial, even though he knew the trial was going on, and [appellant's] trial attorney was present." Aweis "never spoke to trial counsel, the prosecutor, or the police." Aweis visited [appellant] in jail "seven times in 2012." (July 19, 2017 Decision at 3.)

{¶ 17} Mowlina Aboke testified that Abdi Mohamed came into Aboke's barbershop "after the offenses occurred with 'a patch or something' on 'his neck or head.' " Mohamed "said 'he got hit on the night of that incident.' " Mohamed further "said two guys came in to buy khat, and they were robbed." Aboke "did not believe Abdi Mohamed." Aboke "refuted" the averment in his affidavit "that Abdi Mohamed told Aboke that the occupants of the apartment attempted to extort money from [appellant's] family." According to Aboke,

"it was 'not just one person' * * * talking about the $10,000 in his barbershop, that it was not 'the coffee shop guy,' that it was 'the person that got shot.' " This conversation "occurred within a few days or one week of the offenses." Aboke was aware "that [appellant's] trial took place one year later." Aboke "did not tell the police, or the prosecutor, or [appellant's] trial attorney." (July 19, 2017 Decision at 3.)

{¶ 18} Amina Manguera, appellant's aunt, testified and "refuted the statements in her affidavit." Manguera "testified that she told [appellant's] post-conviction attorney that * * * the things you are telling me, it's not correct." (July 19, 2017 Decision at 3.) Manguera "testified, 'Like I told you before, I don't know anything about this. * * * And I'm telling you the same thing again.' " (July 19, 2017 Decision at 3-4.) When Manguera was shown her affidavit "she did not recognize it," and "testified, 'I cannot read or write. They must have wrote those things.' " Manguera "testified that what was said in her affidavit she either did not say or did not remember saying." Manguera "also testified she did not know whether there was a party or drug activity, that she was not there, and that she did not witness anything." (July 19, 2017 Decision at 4.)

{¶ 19} Appellant testified "that he told his trial attorney that the witnesses were not going to come to court * * *, that he never asked his trial attorney to speak with his family, and that his trial attorney provided discovery, which they discussed." Appellant "also acknowledged that his trial attorney visited him eight times while he was in jail." Appellant "did not know of the alleged extortion attempt until after his trial," and testified "that he obtained the 'visiting list' * * * from his 'case manager.' " Appellant "thought two of the victims, Farheyo [Abdulkar] and Abdi Aden, tried to visit him, but they never did, either in prison or in jail." (July 19, 2017 Decision at 4.)

{¶ 20} Trial counsel for appellant, Jeffrey M. Basnett, visited appellant in jail "six times in 2012, and twice in 2013." During these visits, Basnett "repeatedly asked [appellant] to tell him what happened." Appellant "refused, simply stating over and over again that the witnesses were not going to come to court." Appellant "never talked to counsel about any kind of extortion plot or anything like that." (July 19, 2017 Decision at 4.)

{¶ 21} Basnett "never spoke to [appellant's] brother, never had contact with [appellant's] brother, and never received any messages from [appellant's] brother, even though * * * Basnett's office was right across the street from the courthouse." (July 19, 2017

Decision at 4-5.)  Basnett "also never spoke with Mowlina Aboke or Amina Manguera." (July 19, 2017 Decision at 5.)

{¶ 22}  Appellant's "Exhibit 15, attached to his post-conviction petition and identified as 'Jail Visitation List' is an ORDC document, and is not a list of persons who visited [appellant] in prison."  (July 19, 2017 Decision at 5.)

{¶ 23}  Based on the evidence presented, the trial court concluded trial counsel "did not fail to investigate [appellant's] case, and [appellant] failed to demonstrate deficient performance in the investigation."  (July 19, 2017 Decision at 10.)  The court further found trial counsel did not render deficient performance in failing to subpoena Aboke or appellant's brother, "particularly because neither person was present at the scene, neither had any first-hand knowledge about the offenses, and neither could provide any admissible evidence."  The court determined "trial counsel could not question witnesses about an alleged extortion plot or 'victims' saying no robbery occurred, because trial counsel was not informed of these assertions at any time before or during [appellant's] week-long trial." (July 19, 2017 Decision at 11.)  Finally, the court found assertions regarding an alleged extortion plot "not credible."  (July 19, 2017 Decision at 12.)  Thus, the trial court denied the petition for post-conviction relief and motion for new trial.

{¶ 24}  On appeal, appellant sets forth the following four assignments of error for this court's review:

> FIRST ASSIGNMENT OF ERROR
>
> APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO INVESTIGATE, RESEARCH AND PREPARE A DEFENSE.
>
> SECOND ASSIGNMENT OF ERROR
>
> APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT MITIGATION EVIDENCE.

THIRD ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN DISREGARDING POST-CONVICTION WITNESSES' TESITMONY AND WITH RESPECT TO ITS FINDINGS OF FACT.

FOURTH ASSIGNMENT OF ERROR

THE TRIAL COURT REFUSED TO RECEIVE EVIDENCE REGARDING A VISITORS' LIST AT ISSUE IN THE POST-CONVICTION PROCEEDINGS.

{¶ 25} Appellant's assignments of error are interrelated and will be considered together. Under these assignments of error, appellant asserts: (1) he was denied his right to effective assistance of counsel through counsel's failure to investigate, research, and prepare a defense, (2) his counsel was ineffective in failing to investigate and present mitigation evidence, (3) the trial court erred in disregarding testimony of post-conviction witnesses, and (4) the trial court erred in refusing to receive evidence regarding a visitor list.

{¶ 26} At the outset, we note that "[p]ostconviction relief is a civil collateral attack on a judgment, not an additional direct appeal of the underlying judgment." *State v. Canada*, 10th Dist. No. 16AP-7, 2016-Ohio-5948, ¶ 12, citing *State v. Phipps*, 10th Dist. No. 14AP-545, 2015-Ohio-3042, ¶ 5, citing *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999). A petition for post-conviction relief permits a petitioner "to present constitutional issues that would otherwise be unreviewable on direct appeal because the evidence supporting those issues is not contained in the record of the criminal conviction." *Id.,* citing *Phipps* at ¶ 5, citing *State v. Carter*, 10th Dist. No. 13AP-4, 2013-Ohio-4058, ¶ 15. However, a petition for post-conviction relief does not provide the petitioner "a second opportunity to litigate the conviction." *Id.*

{¶ 27} The Supreme Court of Ohio has held that "a trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion; a reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 58.

{¶ 28} Under Ohio law, "[t]he decision to grant or deny a defendant's motion for a new trial based on newly discovered evidence is governed by Crim.R. 33." *State v. Love*, 1st Dist. No. C-050131, 2006-Ohio-6158, ¶ 34. Specifically, "[u]nder Crim.R. 33(A)(6), a new trial may be granted when 'new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial.' " *Id.* A trial court's decision "to grant or deny a motion for a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed." *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993), citing *State v. Williams*, 43 Ohio St.2d 88 (1975), paragraph two of the syllabus.

{¶ 29} In order to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant "must show that 'counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance.' " *In re C.C.*, 10th Dist. No. 04AP-883, 2005-Ohio-5163, ¶ 101, quoting *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998). Further, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*, citing *Strickland* at 686. In considering the two-part test for such claims, a defendant must first show that "counsel's performance was objectively deficient by producing evidence that counsel acted unreasonably." *Id.* Second, a defendant must "show that, but for [his or] her counsel's errors, there is a reasonable probability that the results of the trial would be different." *Id.* In this respect, " '[a] reasonable probability is a probability sufficient to undermine the confidence in the outcome.' " *Id.*, quoting *State v. Carpenter*, 116 Ohio App.3d 615, 622 (2d Dist.1996).

{¶ 30} Appellant first asserts his trial counsel was ineffective in failing to properly investigate the case, including failure to request an investigator, subpoena witnesses, and seek camera footage from across the street from the incident. Related to his claim of failure to investigate, appellant argues his trial counsel failed to speak with appellant's brother, who purportedly had information regarding an extortion plot involving witnesses. Appellant also argues his counsel only visited him in jail 6 times over a 12-month period, and that counsel failed to discuss potential defenses with him, including self-defense.

Finally, appellant contends the evidence shows his counsel was unable to adequately prepare for trial because of health issues (i.e., a cancer diagnosis) and a heavy case load.

{¶ 31} In response, the state initially asserts that several arguments raised by appellant in this appeal are procedurally barred as having been previously addressed and decided by this court. Specifically, the state argues this court has already rejected arguments with respect to issues involving: (1) counsel's purported failure to inform appellant of the propriety of a self-defense theory, (2) whether counsel was ineffective for failing to secure an alleged security video, (3) an allegation that the victim's apartment was a drug house, and (4) an alleged fight between appellant and Abdi Mohamed ten days prior to the robbery. We agree.

{¶ 32} In *Ibrahim II,* this court addressed the claim by appellant that "trial counsel was ineffective because he failed to inform appellant regarding the affirmative defense of self-defense." *Id.* at ¶ 16. We found appellant failed to "support this argument in his appellate brief * * * other than to say that, when his postconviction relief attorney explained self-defense to him, he realized it would have been applicable to him." *Id.* We concluded that "[t]his claim could have been raised on direct appeal and, accordingly, is barred by res judicata." *Id.*

{¶ 33} This court also addressed the claim by appellant that his counsel was ineffective for "failing to secure footage from security cameras located in front and in back of the apartment." *Ibrahim II* at ¶ 22. We noted that, "[a]lthough affiant Abdullah Aboke avers that the security cameras existed, neither he nor appellant aver that they viewed the security footage." *Id.* This court found appellant's self-serving affidavit was "legally insufficient to establish operative facts with regard to this claim," and we therefore "affirm[ed] the trial court's denial of the petition for postconviction relief on grounds of ineffective assistance of trial counsel for failure to secure footage from security cameras." *Id.*

{¶ 34} This court further addressed and rejected claims by appellant that his counsel should have questioned witnesses at trial regarding "the fact that the apartment was a known drug house," and "the fact that appellant had an altercation with Abdi Mohamed ten days prior to the robbery." *Ibrahim II* at ¶ 17. We observed that "numerous witnesses testified that the apartment was a known drug house," and that "[a]ppellant also testified

that he and Abdi Mohamed had gotten into it on the streets before." *Id.* Noting that "[a]ll of this was clear from the transcript," we concluded that "[t]hese claims could have been raised on direct appeal and * * * are barred by res judicata." *Id.*

{¶ 35} The state further argues this court previously addressed and rejected the claim now raised by appellant under his second assignment of error, in which he asserts ineffective assistance of counsel based on counsel's failure to investigate and present mitigation evidence, including evidence that he was the father of two sons. Again, we agree with the state's contention.

{¶ 36} In *Ibrahim II,* appellant "claimed ineffective assistance of counsel for failure to call witnesses to supply information on his behalf for the purpose of mitigation of his sentence." *Id.* at ¶ 34. Appellant asserted that these witnesses "would have testified that he is a devoted father of two young sons and a hard worker employed in the construction trade." *Id.* This court rejected that claim, noting that "decisions regarding what witnesses to call falls within the purview of trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel." *Id.* at ¶ 35. This court also noted "appellant himself informed the court that he had a family." *Id.* We further found no showing of a "reasonable probability that the evidence would have swayed the jury to impose a lesser sentence." *Id.* We therefore "affirm[ed] the trial court's denial of the petition for postconviction relief without a hearing on grounds of ineffective assistance of trial counsel for failure to raise mitigating evidence at sentencing." *Id.*

{¶ 37} The "law of the case" doctrine "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). Accordingly, "the decision of an appellate court in a prior appeal will ordinarily be followed in a later appeal in the same case and court." *Id.* at 4. In this respect, "[t]he doctrine of the law of the case 'is a rule of practice analogous to estoppel.' " *State v. Hultz*, 9th Dist. No. 07CA0043, 2008-Ohio-4153, ¶ 5, quoting *Hopkins v. Dyer,* 104 Ohio St.3d 461, 2004-Ohio-6769, ¶ 22. Further, "[o]n this court's remand for limited purposes, the trial court was obliged to accept all issues previously adjudicated as finally settled." *Blackwell v. Internatl. Union, United Auto Workers Local No. 1250*, 21 Ohio App.3d 110,

112 (8th Dist.1984).  Here, to the extent appellant raises claims of ineffective assistance of counsel previously addressed and rejected by this court, we will not revisit those issues.

{¶ 38} We further agree with the state that appellant has raised several new arguments that are not properly before us on appeal.  Specifically, appellant asserts his trial counsel was ineffective in: (1) failing to request a continuance when the victims appeared for trial, and (2) in not challenging his convictions based on the state's failure to call 2 of the 11 victims to testify.  However, as argued by the state, appellant failed to raise the first argument before the trial court and, with respect to the latter claim, such argument should have been raised on direct appeal rather than in a post-conviction proceeding.  The failure to raise an issue in a petition for post-conviction relief results in a waiver of a right to assert that issue for the first time on appeal.  *State v. Barb,* 8th Dist. No. 94054, 2010-Ohio-5239, ¶ 25.  In a similar vein, "a petitioner cannot raise, for purposes of postconviction relief, an error that could have been raised on direct appeal."  *State v. Bennington*, 4th Dist. No. 12CA956, 2013-Ohio-3772, ¶ 9.

{¶ 39} We therefore now turn to the issues properly before this court on appeal.  As previously noted, in *Ibrahim II* this court affirmed in part and reversed in part the trial court's decision denying appellant's petition for post-conviction relief, finding the trial court "did not address appellant's extortion claims, nor the purported jail visitor list."  *Id.* at ¶ 32.  This court thus remanded the matter for a hearing on those issues.

{¶ 40} With respect to the jail visitor list, appellant averred in his affidavit in support of his petition: "As the attached jail visitor's roster indicates, Farheyo Adbukar and Abdi Aden, who were alleged victims, attempted unsuccessfully to visit me at jail."  (Appellant's Aff. at ¶ 115.)  In addressing that issue in *Ibrahim II*, this court found in part: "Also lending credibility to the averments of Mowlina, Manguera, Aweis and appellant is exhibit No. 15, a purported jail visitor list showing that two of the prosecuting witnesses, Farheyo Adbulkar and Abdi Aden, attempted to visit appellant in jail."  *Id.* at ¶ 30.  This court further noted that potential cross-examination of "Farheyo and Aden" by appellant's counsel on certain issues, "in particular with regard to the jail visitor list, could have been damaging to the credibility of all the witnesses."  *Id.* at ¶ 31.

{¶ 41} On remand, the trial court heard evidence regarding the jail visitor list, including testimony by Trevor Clark, the assistant chief counsel for ODRC.  At the hearing,

Clark identified State's exhibit B (referenced in appellant's post-conviction petition as Defendant's Ex. No. 15) as a printout from ODRC's "tracking system known as the DOTS portal system." (May 22, 2017 Tr. at 12.)  He described the exhibit as "a list of individuals that we have relevant visitation information about." (May 22, 2017 Tr. at 13.)  While noting that the document contained "information about potential visitors," he further clarified: "That's not to indicate that they actually have visited or even applied to visit." (May 22, 2017 Tr. at 14.)

{¶ 42} Clark was questioned about the fact the names of two victims, "Farheyo Adbukar and Abdi Aden," appeared on the list.  Clark was "not able to tell from the DOTS portal system" why their names were on the list.  He was also questioned about the fact the letter "R" appeared "to the far right of this column * * * under Adbukar and Abdi Aden." Clark stated the "R" designation "stands for restricted," and "the reason or relation listed for why they are restricted is that they are a victim."  He defined "restricted" to mean "prevented from visiting." (May 22, 2017 Tr. at 15.)  According to Clark, if ODRC obtains information regarding a victim, "we will restrict them and then that information makes it on this list." (May 22, 2017 Tr. at 17.)

{¶ 43} Clark identified state's exhibit D as a "Visitor Application Tracking document," and he identified state's exhibit C as "a visitation log." (May 22, 2017 Tr. at 22.) Clark testified that neither Farheyo nor Aden had ever applied for permission to visit appellant, and that neither of those names appear on the visitation log.

{¶ 44} In its decision on post-trial motions, the trial court found the exhibit at issue (defendant's exhibit No. 15), attached to the post-conviction petition and identified as a jail visitation list, "was not a jail visitor list at all, but rather a document prepared by the Ohio Department of Rehabilitation and Correction after the trial."  The trial court further found "the purported 'visitors' were actually names of persons who were not permitted to visit." (Emphasis sic.) (July 19, 2017 Decision on Post-Trial Mot. at 2.)  In its accompanying decision and entry denying the petition, the trial court concluded the jail visitation list was "irrelevant to [appellant's] post-conviction ineffective assistance of trial counsel claim." (July 19, 2017 Decision at 7.)

{¶ 45} On review, we agree with the trial court that the evidence on remand regarding the exhibit does not support the claim by appellant in his affidavit that Farheyo

and Aden attempted to visit him in the county jail prior to trial. Significantly, the evidence indicates the ODRC prison list is a document appellant obtained after his trial and conviction, and the exhibit is not a county jail visitor list but, as indicated, an ODRC document (i.e., not a county jail document but a prison jail document). As this court noted in *Ibrahim II*, "[t]rial counsel cannot be considered ineffective for failing to investigate information gathered after trial." *Id.* at ¶ 25. Here, the record supports the trial court's determination that defendant's exhibit No. 15 was irrelevant to the petition (i.e., not relevant to a claim of ineffective assistance for failure to conduct an adequate pretrial investigation).

{¶ 46} We next consider the evidence before the trial court as to the alleged extortion claim. During the remand hearing, appellant presented the testimony of three witnesses, Amina Manguera, Mowlina Aboke, and Aweis Ibrahim, who had previously averred, in affidavits in support of the petition, statements regarding a purported extortion plot by witnesses who testified at trial as to the events at the residence of Farheyo on January 21, 2012.

{¶ 47} The record indicates that Aweis (the brother of appellant), in his November 2013 affidavit offered in support of appellant's petition for post-conviction relief, averred that "Somalilander witnesses approached my family offering them $10,000 in exchange for their silence at Mohamed Ibrahim's trial." (Aweis Ibrahim Aff. at ¶ 24.) Aweis, who also stated in that affidavit that Farheyo, one of the alleged victims, attempted unsuccessfully to visit appellant in jail, further averred: "I personally heard Farheyo * * * indicating that she wanted Mohamed Ibrahim to keep his mouth shut concerning her drug operation." (Aweis Ibrahim Aff. at ¶ 27.) Aweis also stated in his affidavit: "I am personally aware that Abdi Mohamed, owner of the Star Coffee Shop has been bragging at Star Coffee that he beat Mohamed Ibrahim, the member of another Somalian tribe, and put him in jail." (Aweis Ibrahim Aff. at ¶ 17.)

{¶ 48} During the hearing on remand, Aweis testified that appellant and Abdi Mohamed, the owner of a coffee shop, had been involved in a fight at the coffee shop just prior to the incident at Farheyo's apartment. Aweis stated that Abdi Mohamed later bragged about beating appellant and putting him in jail. On direct examination, Aweis was questioned about how he knew of the information in paragraph 24 of his affidavit (in which

he stated Somalilander witnesses approached his family offering them $10,000 in exchange for their silence at trial). Aweis responded: "They was talking about it in the coffee shop and * * * one of the guy[s] come to me particularly and asked me about that, talk to your phone number about this exodus, so we could shut it down and take the $10,000." (Oct. 4, 2016 Tr. at 20.) Aweis stated he called appellant's counsel "one time" before the trial, and that "[s]everal times" he went to the attorney's office. (Oct. 4, 2016 Tr. at 21.) He "never reached the attorney." (Oct. 4, 2016 Tr. at 20.) Aweis later stated he called the attorney's office "[a]bout four or five times." (Oct. 4, 2016 Tr. at 21.)

{¶ 49} Aweis stated that Abdul Aden is a "former uncle by marriage" with respect to appellant's family. (Oct. 4, 2016 Tr. at 24.) Aweis testified that Aden, who was in the apartment building during the incident, "asked for the $10,000." When further questioned during direct examination whether Aden was the individual who asked for money, Aweis responded: "He and the lady that owned the place, a couple of guys asked for the money." (Oct. 4, 2016 Tr. at 25.) Aweis visited appellant in jail while awaiting trial, but testified he was afraid to come to trial.

{¶ 50} On cross-examination, Aweis stated he was not in the apartment building during the incident. Aweis acknowledged visiting appellant a number of times in jail prior to trial, including on January 30, February 20, March 12, June 11, August 3 and 31, and October 1, 2012. Aweis stated he came to the courthouse on at least two occasions at the time of trial, but "[t]hey changed * * * the date." (Oct. 4, 2016 Tr. at 39.) When asked if he ever attempt to seek out appellant's counsel during the trial, Aweis responded: "I don't even know Jeff, how he looks. How would I get his attention?" (Oct. 4, 2016 Tr. at 45.) Aweis also acknowledged he did not attempt to contact the prosecutor or police with information of an extortion plot. When asked if he made any attempt to tell anyone of this information prior to trial, Aweis responded: "No." (Oct. 4, 2016 Tr. at 56.)

{¶ 51} In considering the testimony of Aweis, the trial court noted the obvious "interest" of appellant's brother in "the outcome of these proceedings." (July 19, 2017 Decision at 7.) As to statements by Aweis regarding an extortion plot, the trial court found such testimony "vague and uncertain," and that the witness failed to provide "specific, detailed information regarding these assertions." The trial court noted that Aweis "failed to come forward with this information at any time before or during" trial, "even though he

was aware of the pendency of [appellant's] case." (July 19, 2017 Decision at 8.) The court, further noting that Aweis "said he did not do anything with the information except to try to pass it on – without success – to the defense attorney," found Aweis' "testimony about his efforts to contact the attorney * * * not credible." The trial court also deemed significant the fact Aweis did not, prior to trial, "bother to tell his brother [appellant]" about a purported extortion plot. (July 19, 2017 Decision on Post-Trial Mot. at 2.) Noting that Aweis "was not present at the scene of the offenses," the trial court concluded that the witness was unable to provide admissible evidence regarding the incident, and that his testimony "generally lacked credibility." (July 19, 2017 Decision at 8.)

{¶ 52} Here, the record supports the trial court's finding that Aweis never came forward with information of an alleged extortion plot prior to trial. As indicated, the trial court also found the testimony vague and lacking in specifics. We note that Aweis, while stating in his affidavit that it was "Somalilander witnesses" who approached his family offering money for their silence at trial, testified at the hearing that it was Aden "and the lady that owned the place, a couple of guys asked for the money." (Oct. 4, 2016 Tr. at 25.) He also testified "[t]hey" were talking about it in the coffee shop, and that "one of the guy[s] come to me" to talk so we "could shut it down and take the $10,000." (Oct. 4, 2016 Tr. at 20.) While stating he attempted to phone appellant's counsel at least one time prior to trial, Aweis acknowledged he never spoke with appellant's counsel, nor did he attempt to contact anyone else, including the prosecutor's office or the police, with information of an extortion plot.

{¶ 53} Under Ohio law, credibility determinations "are primarily for the trial court as the trier of fact" in a case. *State v. Jordan*, 6th Dist. No. L-18-1147, 2019-Ohio-2647, ¶ 45. In addressing the credibility of this witness, the trial court could have reasonably considered any bias or interest that Aweis, the brother of appellant, had in the outcome of the proceedings. *See Calhoun* at 287 (trial court did not abuse its discretion in dismissing credibility of affiants who "are relatives of the petitioner or otherwise interested in the success of petitioner's efforts"); *State v. Group*, 7th Dist. No. 10 MA 21, 2011-Ohio-6422, ¶ 124 (trial court reasonably determined affidavit of defendant's mother lacked credibility as it relied on hearsay, and because affiant, as the relative of petitioner, "clearly has an interest in the outcome of the case"). In addition to the trial court's determination that

Aweis never came forward with critical evidence of an alleged extortion plot prior to trial, the record also supports the trial court's finding that Aweis never informed appellant, prior to trial, of such a plot even though Aweis acknowledged visiting his brother numerous times in jail. On review, we decline to disturb the trial court's credibility determinations as to the testimony of appellant's brother in support of post-conviction relief.

{¶ 54} We next address the trial court's consideration of the hearing testimony of affiant Mowlina Aboke. In his November 2013 affidavit, Aboke stated he was "the owner of Certified Cuts barber shop in Columbus, Ohio." (Aboke Aff. at ¶ 24.) Aboke averred in his affidavit that, after the incident at the Eakin Road apartment, "Abdi Mohamed, the owner of Star Coffee Shop * * * came to my barbershop and began talking about what had occurred during the January 21, 2012 incident." (Aboke Aff. at ¶ 25.) According to Aboke, "Abdi Mohamed told me that there had been no robbery, and that the occupants of [the apartment] falsely reported that they had been robbed to protect themselves and the others from drug charges after Mohamed Ibrahim viewed quantities of drugs and money inside the Eakin Rd. apartment on January 21, 2012." (Aboke Aff. at ¶ 26.) Aboke further stated that "Abdi Mohamed had been in a fight with Mohamed Ibrahim about 10 days preceding the alleged robbery incident and was suspicious that he might have been a drug informant." (Aboke Aff. at ¶ 27.) Aboke also averred that "Abdi Mohamed told me before Mohamed Ibrahim's trial that the occupants of the [apartment] had offered $10,000 to the family to make the case go away." (Aboke Aff. at ¶ 29.)

{¶ 55} Aboke, age 27, testified at the remand hearing regarding the statements in his affidavit. Aboke, who was born in Somalia, is the owner of a barbershop in Westerville and previously owned a barbershop in Columbus. Aboke testified that Abdi Mohamed, a barbershop client, was at the barbershop and Aboke observed "something on his neck or his head." (Oct. 4, 2016 Tr. at 65.) Mohamed "told me two guys came in and pretty much they were, I guess, buying that - - it was called khat." Aboke further testified: "And then he told me that they got robbed, but which he was saying at the time I don't think it was true 'cause he was just stumbling through his words." (Oct. 4, 2016 Tr. at 66.)

{¶ 56} During direct examination, counsel for appellant inquired whether Abdi Mohamed "told you that there had not been a robbery?" Aboke responded "[y]es," and that "[h]e [Mohamed] made it up pretty much" because of "the drugs that was there." (Oct. 4,

2016 Tr. at 68.)  Counsel for appellant also inquired whether "the guy who owns the Star Coffee Shop [Abdi Mohamed] told you that they had tried to extort $10,000 from [appellant's] family?"  Aboke responded: "Yes."  (Oct. 4, 2016 Tr. at 69.)

{¶ 57}  On cross-examination, Aboke testified that Abdi Mohamed came into the barbershop a week after the January 2012 incident.  Aboke stated that he spoke with appellant's brother, Aweis, regarding the barbershop conversation.  In response to an inquiry as to when he spoke with Aweis, Aboke stated: "I have no clue."  Aboke testified he did not take this information to the prosecutor or police because he "was scared to talk." (Oct. 4, 2016 Tr. at 79.)  When asked whether he shared this information with anyone other than Aweis, Aboke responded: "No one else."  (Oct. 4, 2016 Tr. at 81.)

{¶ 58}  The prosecutor inquired of Aboke as to when he had the conversation with Abdi Mohamed regarding the $10,000 extortion offer.  In response, Aboke stated: "I didn't say he said.  I heard, that's all I said."  (Oct. 4, 2016 Tr. at 83.)  Upon further inquiry about his (Aboke's) affidavit statement that Abdi Mohamed told him about the $10,000 extortion offer, Aboke stated: "[t]here was a lot of people in the barbershop at the time he was in." The prosecutor then asked whether "somebody else said it," and Aboke responded: "There was a lot of customers there, and they were just talking about that incident that happened." He further stated: "It was not just one person.  It was multiple clients that came in that knew the incident and what happened there."  (Oct. 4, 2016 Tr. at 84.)

{¶ 59}  The prosecutor questioned Aboke whether any of the individuals requesting the $10,000 were "in the barbershop or was it just other people talking about what they heard?"  (Oct. 4, 2016 Tr. at 85.)  Aboke stated: "When I said this $10,000 to the family to make the case go away, is the person that got shot.  That's all I heard, and that's all I said in there."  The prosecutor then further inquired whether it was "the coffee shop guy" who was talking about "wanting 10 grand?"  Aboke responded: "Not him."  (Oct. 4, 2016 Tr. at 86.)

{¶ 60}  In considering the testimony of Aboke, the trial court determined that the witness "could not provide admissible evidence regarding the incident," and that "his testimony generally lacked credibility."  The court made the following further findings regarding the testimony of this witness: (1) Aboke "was not present at the scene of the offenses"; (2) he "provided only vague and uncertain testimony regarding the purported extortion attempt," as he "first refuted his statement in his affidavit that 'Abdi Mohamed'

told him of the alleged extortion attempt," and he "also testified that there were a lot of people in his barbershop allegedly talking about the attempted extortion of [appellant's] family"; (3) Aboke "testified that he did not believe 'Abdi Mohamed' when he said there had been a robbery," and "Aboke also testified, in response to leading questions, that Abdi Mohamed said there was not [a] robbery and that 'he made it up' "; and (4) Aboke "was aware of the pendency of [appellant's] case, but did not come forward with this information," and he "never spoke to the police, the prosecutor, or [appellant's] counsel." (July 19, 2017 Decision at 8.)

{¶ 61} On review, the record supports the trial court's finding that Aboke refuted his own affidavit statement that Abdi Mohamed told him the occupants of the Eakin Road apartment had offered $10,000 to the family. As cited above, in response to an inquiry during cross-examination as to when Abdi Mohamed made this statement, Aboke stated: "I didn't say he said. I heard, that's all I said." (Oct. 4, 2016 Tr. at 83.) He further stated: "There was a lot of customers there, and they were just talking about that incident that happened." According to Aboke, "[i]t was multiple clients that came in that knew the incident and what happened there." (Oct. 4, 2016 Tr. at 84.) Aboke later testified: "When I said this $10,000 to the family to make the case go away, is the person that got shot. That's all I heard, and that's all I said in there." (Oct. 4, 2016 Tr. at 86.)

{¶ 62} As noted by the state, while Aboke testified that he heard the conversation about an extortion plot a "[w]eek after" the incident, the record indicates the individual who was shot during the incident, Hirsi Hirsi, was still in the hospital at that time (i.e., Hirsi could not have been the individual in the barbershop discussing an extortion plot).[1] (Oct. 4, 2016 Tr. at 76.) As also reflected above, Aboke testified the only individual he spoke with regarding this information was appellant's brother, Aweis, although Aboke had "no clue" when that conversation occurred. (Oct. 4, 2016 Tr. at 79.) Aboke also acknowledged, as found by the trial court, that he never attempted to contact the police, prosecutor, or appellant's counsel during the almost one-year time period between when he first learned of the information and the start of the trial. As with the testimony of appellant's brother, we will not disturb the trial court's credibility determination as to this witness.

---

[1] At trial, Hirsi Hirsi testified that he received a bullet wound to the stomach during the incident. Hirsi stated he had surgery and was treated at Mount Carmel Hospital where he remained "[a]bout two and a half, three weeks." (Jan. 23, 2013 Tr. Vol. I at 208.)

{¶ 63} Appellant's aunt, Amina Manguera, was also called as a witness by appellant during the remand hearing. In addressing the testimony of Manguera, the trial court concluded that the witness "refuted her affidavit in its entirety," and that "[h]er averments are not credible." (July 19, 2017 Decision at 7.) The record supports the trial court's determination.

{¶ 64} In her November 2013 affidavit, Manguera stated she "personally spoke with one of the alleged victims who was present at 3740 Eakin Rd. Apt. #11 at the time of the January 21, 2012 incident," and that she "spoke with him after the incident * * * took place, but before Mohamed Ibrahim's trial." (Manguera Aff. at ¶ 5.) Manguera averred that this "victim" told her "the occupants * * * had beaten Mohamed Ibrahim because he had witnessed quantities of drugs and money inside the apartment and that they made up the robbery story because they were afraid he was going [to] reveal their 'secret.' " (Manguera Aff. at ¶ 6.) Manguera further averred: "The alleged victim who spoke to me after the incident * * * told me no robbery had occurred, but that if the family would give the group $10,000 they would remain silent and make the case go away." (Manguera Aff. at ¶ 8.)

{¶ 65} During the remand hearing, Manguera testified she was appellant's "maternal aunt." (Mar. 6, 2017 Tr. at 5.) When questioned about her affidavit statements that she personally spoke with one of the alleged victims following the incident, and that this victim told her the occupants had beaten appellant because he had witnessed drugs and money inside the apartment, Manguera responded: "No, they didn't know me. How we going to talk to each other?" (Mar. 6, 2017 Tr. at 11.) Upon further inquiry whether she had spoken with a victim as set forth in paragraphs 5 and 6 of her affidavit, Manguera stated: "No, I did not talk to him." (Mar. 6, 2017 Tr. at 12.) When asked whether she had made any of the statements in her affidavit, Manguera responded: "There must be some sort of a misunderstanding." (Mar. 6, 2017 Tr. at 17.) Thus, the record supports the trial court's finding that Manguera refuted all the statements in her affidavit, including statements that a victim had told her no robbery had occurred but that they would remain silent if the family would give the group $10,000.

{¶ 66} Here, the trial court heard testimony during the remand hearing from the three affiants (Aweis, Aboke, and Manguera) and made credibility determinations as to their averments per this court's remand directive. With respect to the primary issues

involving whether prosecuting witnesses were involved in an extortion plot, and whether Abdi Mohamed or another prosecuting witness stated a robbery did not occur, the trial court found the testimony of the affiants on these issues vague and uncertain, and generally lacking in credibility. As addressed above, based on this court's review of the record, and giving "deference to the trial court's post-evidentiary-hearing findings and credibility determinations," we find no error regarding those determinations. *State v. Mackey*, 2d Dist. No. 2017-CA-42, 2018-Ohio-516, ¶ 8. *See also Gondor* at ¶ 47, citing *State v. Braden*, 10th Dist. No. 02AP-954, 2003-Ohio-2949, ¶ 13 ("when a trial court rules on a petition for post-conviction relief after a hearing, an appellate court will give deference to the trial court's findings of fact").

{¶ 67} As noted by the state, none of the above witnesses came forward at any time during the nearly one-year period appellant's case was pending (nor during the week-long trial) with information regarding an extortion plot. Further, the record indicates appellant's brother, Aweis, who visited appellant numerous times during that time period, never told appellant about such a plot. As also noted by the state, while appellant's brother stated in his affidavit that Abdi Mohamed bragged "that he beat" appellant "and put him in jail," such fact was never disputed as numerous witnesses testified that they overcame their assailants in the apartment and beat them and held them until police officers arrived.

{¶ 68} In *Ibrahim II*, this court also deemed relevant an exhibit (the "jail visitor list") attached to appellant's petition in support of his claim that two trial witnesses (Farheyo and Aden) attempted to visit him in jail, purportedly going to the issue of an extortion plot. We have noted, however, that the evidence developed from the remand hearing supports the trial court's determination that the document was irrelevant to the issues in the petition, as the record indicates the exhibit at issue was an ODRC document (i.e., not a county jail visitor list) obtained by appellant after trial (and the record belies any claim by appellant in his post-conviction affidavit that the witnesses at issue, as part of an extortion plot, attempted to visit him in jail before trial).

{¶ 69} In addressing other issues raised in the petition, the trial court made findings that trial counsel visited appellant six times in 2012 and two times in 2013, and that counsel "provided discovery, which they discussed." The court noted testimony by appellant that he told his counsel "the witnesses were not going to come to court," and he "never asked his

trial attorney to speak with his family." (July 19, 2017 Decision at 4.) The court found that trial counsel "never spoke to [appellant's] brother, never had contact with [appellant's] brother, and never received any messages from [appellant's] brother, even though [counsel's] office was right across the street from the courthouse." (July 19, 2017 Decision at 4-5.) The court also found that counsel for appellant "never spoke with Mowlina Aboke or Amina Manguera." (July 19, 2017 Decision at 5.)

{¶ 70} During the remand hearing, the trial court heard testimony from both appellant and appellant's trial counsel, Jeff Basnett. Appellant testified he spoke to his attorney "about my case." Appellant "also did tell [Basnett] that the witnesses were not going to come to court." (Mar. 6, 2017 Tr. at 109.) Appellant stated that he "asked for an investigator," and "I kept asking him repeatedly if he spoke * * * to my alleged victims at the time." (Mar. 6, 2017 Tr. at 110.)

{¶ 71} Appellant "did not ask [Basnett] to talk to my family." (Mar. 6, 2017 Tr. at 111.) Appellant acknowledged his counsel provided him copies of discovery, and appellant had the opportunity to review the discovery materials. Appellant testified that he told his attorney he did not agree with everything in the discovery, and that he "told Mr. Basnett that I went to the address to buy drugs." (Mar. 6, 2017 Tr. at 112.) Appellant stated that his attorney "came to see me eight times." (Mar. 6, 2017 Tr. at 113.) Appellant further testified that he was concerned because his counsel "was coughing too much" during the trial. (Mar. 6, 2017 Tr. at 117.) Appellant stated that Basnett is "a good lawyer, but he was not good with me, because at the time he was sick. He was ill." (Mar. 6, 2017 Tr. at 147.) Appellant was unaware of information regarding an extortion plot of $10,000 at the time of trial.

{¶ 72} Basnett testified he has been a licensed attorney since 1991. He was previously employed by the public defender's office until 2007, at which time he entered private practice. Approximately 90 percent of his practice involves criminal cases. Basnett became involved in appellant's case in February 2012. Appellant's co-defendant, Noor, was represented by attorney "Dan Sabol." (Mar. 6, 2017 Tr. at 34.) The cases were tried together, and the same witnesses testified in both cases. Both appellant and his co-defendant were convicted by a jury in January 2013.

{¶ 73} Basnett testified that no friends or relatives of appellant ever contacted him prior to or during trial with information about recanting witnesses or an extortion plot. With respect to information obtained from appellant, Basnett testified that "[d]uring the trial, he started to tell me * * * some information about the case, but he never talked about any type of extortion plots or anything like that."  (Mar. 6, 2017 Tr. at 38.)  According to Basnett, had he been made aware of information regarding an extortion plot or recanting witnesses he would have contacted the prosecutor and then "approach[ed] the judge" about such information.  (Mar. 6, 2017 Tr. at 41.)  Basnett stated that appellant's brother, Aweis, never contacted him, nor was he ever contacted by Mowlina Aboke or Amina Manguera.

{¶ 74} In preparation for trial, Basnett reviewed the state's discovery packet, and provided appellant "a full copy of the discovery and the witness list."  (Mar. 6, 2017 Tr. at 42.)  Basnett testified he "kept going out, talking to my client and asking him to talk to me about the case."  (Mar. 6, 2017 Tr. at 43.)  Basnett visited his client at the Franklin County Jail on February 26, April 29, May 17, June 12, August 17, October 19, 2012, and January 21 and 27, 2013.  In discussions with appellant, Basnett was told by appellant "the victims weren't coming."  Basnett "would say to him * * * that we need to come up with a defense, what went on.  And he just would tell me, 'Don't worry, Mr. Basnett.  These people aren't coming.' "  (Mar. 6, 2017 Tr. at 46.)

{¶ 75} Basnett testified he also worked with Sabol, counsel for co-defendant Noor, "trying to find out what was going on with the case."  (Mar. 6, 2017 Tr. at 45.)  Basnett stated that he and Sabol were both "going to go out and * * * talk to the victims."  (Mar. 6, 2017 Tr. at 46.)  On the scheduled date, Basnett had a conflict so "Sabol went out and talked to the victims, and he told me that he was going to * * * tell me what they said."  Sabol met with the victims and then relayed to Basnett the information he garnered.  Basnett stated that Sabol "came back and told me that, 'Hey, these people are saying exactly what's in the police reports, their statements in the police reports.' "  (Mar. 6, 2017 Tr. at 47.)  Following his discussion with Sabol, Basnett "went out and talked to [appellant] again, telling him, 'Hey * * * my understanding is these people are coming and they're saying the same things * * * in the police reports.' "  (Mar. 6, 2017 Tr. at 47-48.)  According to Basnett, appellant "just told me they weren't coming."  (Mar. 6, 2017 Tr. at 48.)

{¶ 76} Basnett testified that appellant began "telling me information that I should have had ahead of time all during trial, so I was * * * dealing with what people were testifying to; and then he would be telling me information all week during the trial." When asked what type of information appellant provided during trial, Basnett stated that, "although [appellant] had full discovery and had a list of witnesses, he didn't even tell me that one of the alleged victims * * * was an uncle of his until his uncle was on the stand and testified." Basnett stated that appellant also "brought up a fight" he had with "one of the alleged victims * * * but that was during the trial he brought that up." (Mar. 6, 2017 Tr. at 51.) Basnett related that he and his client "were in the holding cell in the back when he finally told me about that." (Mar. 6, 2017 Tr. at 52.)

{¶ 77} Basnett acknowledged he began having health issues in 2012, when he "started losing weight," and that he "really got sick in 2013." He was diagnosed with cancer "at the end of July of 2013." Basnett subsequently underwent chemotherapy and radiation "in the fall" of 2013. (Mar. 6, 2017 Tr. at 49.) Basnett testified that his growing illness had no effect on his trial performance with respect to appellant's case.

{¶ 78} On cross-examination, Basnett was questioned as to why he did not obtain an investigator. Basnett responded: "[I]n order for me to get an investigator, I had to go to the judge, ask him for money, but I'd have to tell him why I need an investigator. And I couldn't just tell the judge * * * my client's telling me that the witnesses weren't coming." (Mar. 6, 2017 Tr. at 64-65.) Basnett stated he "kept going out to my client, asking him, almost begging him, to tell me what was going on with this case," but "he never would tell me anything." (Mar. 6, 2017 Tr. at 79.) When asked whether appellant maintained his innocence, Basnett responded: "No." (Mar. 6, 2017 Tr. at 89.)

{¶ 79} On re-direct examination, Basnett stated the discovery materials he reviewed for trial included police reports, all witness statements, photos of the crime scene, and photos of his client at the hospital. Basnett testified he reviewed "all the discovery" with appellant, and "[k]ept constantly going over it with him and did talk to him about the different issues and things that we needed to bring up," but "every time I would talk to him, he just told me that these people weren't coming, and he wouldn't tell me why." (Mar. 6, 2017 Tr. at 98.)

{¶ 80} In addressing trial counsel's performance, the trial court noted it was "familiar with trial counsel who has practiced in Franklin County Common Pleas Court for more than two decades and knows trial counsel to be a competent, diligent, hard-working, and skilled criminal defense lawyer." The trial court further noted it had "presided over [appellant's] trial during which trial counsel performed competently, making pertinent and timely objections, cross-examining the State's witnesses, presenting evidence, and making cogent arguments on [appellant's] behalf." The trial court found "counsel's subsequent serious medical diagnosis had absolutely no effect on his representation of [appellant] based on trial counsel's testimony and * * * the Court's personal observations of counsel during the trial." (July 19, 2017 Decision at 9.)

{¶ 81} With respect to trial counsel's pretrial investigation, the trial court noted that counsel "obtained and reviewed the discovery provided by the State, including the 11 witness statements." Trial counsel "also spoke with co-defendant's counsel, who interviewed the witnesses and confirmed that they were saying the same thing as in their statements to police." (July 19, 2017 Decision at 9.) The trial court found that "trial counsel repeatedly met with [appellant] and asked [appellant] to tell what happened," but that "[appellant] refused to tell his attorney what happened, and only said, repeatedly, that the State's witnesses were not going to come to court." The trial court noted "trial counsel was never told of any alleged extortion attempt or that 'victims' were saying that no robbery occurred before or during [appellant's] trial." The court further found appellant "did not tell his attorney of the purported extortion," nor did appellant ever ask his attorney "to interview his brother." The trial court concluded that "trial counsel did not fail to investigate [appellant's] case, and [appellant] failed to demonstrate deficient performance in the investigation." (July 19, 2017 Decision at 10.)

{¶ 82} The trial court further determined trial counsel did not render deficient performance in failing to subpoena appellant's post-conviction witnesses, as "trial counsel was not apprised of these persons at any time before or during [appellant's] trial, either by [appellant] or anyone else." Regarding trial counsel's failure to subpoena either Aweis or Aboke, the trial court noted "neither person was present at the scene, neither had any first-hand knowledge about the offense, and neither could provide any admissible evidence." In this respect, the trial court found trial counsel "could not question witnesses about an

alleged extortion plot or 'victims' saying no robbery occurred" as counsel "was not informed of these assertions at any time before or during defendant's week-long trial." (July 19, 2017 Decision at 11.) The court further found appellant "failed to present any credible evidence that the robberies did not occur or that victims attempted to extort money to make the case go away" and that, "even if any extortion attempt did take place, that wouldn't show * * * the robberies didn't occur." (July 19, 2017 Decision on Post-Trial Mot. at 2.)

{¶ 83} Based on the evidence presented at the remand hearing, the trial court concluded trial counsel did not render deficient performance under *Strickland*. The trial court alternatively addressed the second prong of *Strickland* and found appellant failed to establish prejudice, "or a reasonable probability of a different outcome" on the basis "there was overwhelming credible evidence of [appellant's] guilt, and because none of his post-conviction witnesses were present at the scene." Specifically, the trial court held the state presented "credible testimony from nine of the 11 victims present at the scene, who described the terrifying ordeal [appellant] and his codefendant perpetrated that night during the armed home invasion, armed robberies, violent assaults, and shooting." The trial court noted "[appellant] and his codefendant were found inside the victim's apartment when the police arrived," that "[appellant] was dressed in dark clothing" and had "a blue latex glove on his hand," and that "his DNA was recovered from the ski mask and the gun found at the scene." (July 19, 2017 Decision at 12.)

{¶ 84} On review, we find the trial court properly addressed issues raised by this court's remand directive, and that the court's factual findings are supported by the record. As noted, this court remanded for a hearing on the petition based primarily on statements by three affiants (Aweis, Aboke, and Manguera). As already addressed above, we will not disturb the trial court's credibility determinations with respect to the testimony of those witnesses.

{¶ 85} The record also supports the trial court's findings that appellant told his trial attorney the witnesses against him were not going to testify, and that he never asked Basnett to speak with his family. Similarly, the record supports findings by the trial court that appellant's counsel reviewed discovery materials with appellant and visited him eight times in jail while awaiting trial, and neither appellant nor his attorney were aware of any alleged extortion plot prior to trial. Further, while appellant testified that he "believe[d]"

two of the victims attempted to visit him in jail, the hearing evidence did not indicate these individuals visited him either in jail or in prison.  (Mar. 6, 2017 Tr. at 143.)  Rather, as noted by the trial court, "the purported 'visitors' were actually names of persons who were <u>not</u> permitted to visit." (Emphasis sic.)  (July 19, 2017 Decision on Post-Trial Mot. at 2.)

**{¶ 86}**  Appellant challenges the trial court's determination that his trial counsel conducted an adequate pretrial investigation.  In general, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* at 691.  In this respect, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*  Further, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

**{¶ 87}**  The record indicates that trial counsel, in preparing for trial, reviewed the discovery materials provided by the state, including 11 witness statements that were essentially consistent regarding the events at issue.  As noted above, it is undisputed that counsel reviewed those statements with appellant, as well as the other contents of the discovery packet.  It is also undisputed Basnett had at least 8 pretrial meetings with appellant.  Basnett testified he attempted to discuss the case with his client, but that appellant was not forthcoming with information, and repeatedly indicated witnesses were not going to testify against him at trial.

**{¶ 88}**  In gathering information for the case, Basnett related he also "was working with Mr. Sabol," counsel for the co-defendant.  (Mar. 6, 2017 Tr. at 45.)  Sabol interviewed the state's witnesses, and then met with Basnett to share that information.  Basnett testified he initially planned to go with Sabol to meet with the witnesses, but he was unable to attend that day due to a scheduling conflict.  Sabol informed Basnett that the witnesses " 'are saying exactly what's in the police reports, their statements in the police reports.' " (Mar. 6, 2017 Tr. at 47.)  After his discussion with Sabol, Basnett again met with appellant and told him that the witnesses "are coming and they're saying the same things * * * in the police reports."  (Mar. 6, 2017 Tr. at 48.)  Basnett testified he told appellant "exactly what Mr. Sabol told me."  (Mar. 6, 2017 Tr. at 65.)  According to Basnett, appellant again assured him

"they weren't coming."  (Mar. 6, 2017 Tr. at 48.)  Basnett further testified that appellant began providing information to him during trial.

{¶ 89} Under *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," inasmuch as "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."  *Id.* at 691. Assessing "what investigation decisions are reasonable depends critically on such information."  *Id.*  Even "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.* at 690-91.

{¶ 90} The instant case does not present a failure by trial counsel to conduct any pretrial investigation.  Here, the record indicates counsel focused his investigation on the discovery materials provided by the state.  Basnett testified he received and reviewed a full discovery package from the state, and the discovery materials included witness lists, 11 witness statements, police reports, crime scene photographs, and crime lab reports (including DNA evidence).  Basnett also reviewed those discovery materials with his client on multiple occasions.  The trial court essentially found the decision by trial counsel to rely primarily on the state's discovery materials was not professionally unreasonable based on the amount of evidence provided (as well as Basnett's discussions with co-defendant's counsel, who interviewed the witnesses and confirmed the witnesses' statements as reported by police, and counsel's attempt to elicit information from his client).  We find no error with that determination.  *See State v. Jackson*, 3d Dist. No. 14-09-24, 2009-Ohio-5906, ¶ 14 (trial counsel's decision to review and investigate witnesses and evidence provided in state's discovery filings, and to "not investigate outside of the evidence contained" in such filings, "was reasonable in light of all the evidence provided by the State during discovery"); *Stojetz v. Ishee*, 892 F.3d 175, 196 (6th Cir.2018) (trial counsels' decision limiting investigation to a review of discovery documents provided by the state, as opposed to an independent investigation, not ineffective where state provided significant discovery material and professional judgments supported those decisions).

{¶ 91} Appellant argues Basnett acknowledged he never spoke with appellant's brother, Aweis, and that he failed to subpoena Aboke.  As noted, however, the trial court

did not find credible testimony as to attempts by appellant's brother (or any of the three affiants) to come forward before or during trial with information of recanting witnesses or extortion plots, nor does the record indicate trial counsel was made aware of the identity of the affiants prior to trial. As also noted, the evidence failed to indicate appellant's brother, Aweis, ever told appellant of an alleged extortion plot despite visiting him in jail numerous times during the year prior to trial. Significantly, none of these affiants were eyewitnesses to the events at issue, and we agree with the trial court that counsel's purported failure to discover or locate, as part of a pretrial investigation, potential witnesses he was not aware of (and who were never identified as crime-scene witnesses) did not, under the circumstances, constitute ineffective assistance.

{¶ 92} Appellant also challenges his counsel's failure to interview victims and to hire an investigator. While Basnett testified he was unable to accompany Sabol (co-defendant's counsel) to interview witnesses on the scheduled date, the record reflects Basnett was aware of their anticipated testimony based on his subsequent discussions with Sabol and his review of the witness statements. *See, e.g.*, *Marshall v. Warden, Ross Corr. Inst.*, S.D.Ohio No. 1:09-CV-429 (Nov. 19, 2013), quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.1986) (" 'A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel.' "). Further, although appellant was apparently adamant that the state's witnesses would not appear at trial, the record of the trial court proceedings does not suggest trial counsel was surprised by the testimony of the witnesses. In this respect, the trial court, who presided over appellant's trial, noted "counsel performed competently, making pertinent and timely objections, cross-examining the State's witnesses, presenting evidence, and making cogent arguments on [appellant's] behalf." (July 19, 2017 Decision at 9.)

{¶ 93} Further, "[a]n attorney's decision not to hire an investigator does not equate to a failure to investigate and result in ineffective assistance of counsel." *State v. Hairston,* 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 36, citing *State v. Scott*, 10th Dist. No. 88AP-346 (Sept. 29, 1988). During the remand hearing, Basnett testified as to his decision not to hire an investigator, stating he could not request the trial court to provide an investigator at state expense without a sufficient basis for such request. Under such

circumstances, courts will generally "defer to counsel's conduct as a reasoned strategic decision." *State v. Thompson,* 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 247 (trial counsel's pretrial investigation not deficient in failing to seek court appointment of an investigator where counsel may have determined it would be inappropriate to file a motion because they could not demonstrate a particularized need).

{¶ 94} Appellant also points to trial counsel's health diagnosis, and argues it is reasonable to assume he was suffering significantly before and during trial. As cited above, Basnett testified during the remand hearing that he started losing weight in 2012, and was "probably getting sick" that year, but that he "really got sick in 2013." The record indicates that, while appellant's trial took place in January 2013, Basnett was not diagnosed with cancer until "the end of July of 2013," and he did not undergo treatment until fall 2013. (Mar. 6, 2017 Tr. at 49.) Basnett testified that his illness had no effect on his performance during appellant's trial; Basnett further related that he represented another criminal defendant in a "jury trial at the end of June * * * 2013," and that he "won that jury trial." (Mar. 6, 2017 Tr. at 52.)

{¶ 95} The trial court, who presided over both appellant's jury trial and the post-conviction proceedings, held that "trial counsel's subsequent serious medical diagnosis had absolutely no effect on his representation of [appellant] during the week-long trial" based on the testimony presented at the remand hearing and the trial court's "personal observations of counsel during the trial." (July 19, 2017 Decision at 9.) The record contains competent, credible evidence to support the trial court's findings on that issue.

{¶ 96} On review, we find no error with the trial court's determination that counsel made reasonable professional decisions viewed from counsel's perspective at the time he made them and in considering all the circumstances. We therefore conclude the trial court did not err in finding appellant failed to establish deficient performance of trial counsel under *Strickland*.

{¶ 97} The record also supports the trial court's determination that appellant could not, in any event, satisfy the prejudice prong under *Strickland*. As observed by the trial court, "[i]dentity was never an issue" in this case, as appellant and the co-defendant were taken into custody at the crime scene. (July 19, 2017 Decision on Post-Trial Mot. at 3.) At trial, witnesses testified that appellant entered the residence wearing a ski mask and

carrying a weapon, while co-defendant Noor wore a bandana. As noted under the facts, this court previously cited evidence presented at trial that the intruders "ordered the occupants of the apartment to the floor and began to rob them of their wallets, cell phones and other belongings." *Ibrahim I* at ¶ 2. The assailants "trashed the apartment and terrorized the occupants by kicking them, putting the gun against their heads, and threatening their lives for approximately 30 minutes." *Id.* The evidence further indicated that "appellant pistol-whipped one victim in the head, which not only injured that person [but] caused the gun to discharge," with the bullet striking "another victim in the stomach." *Id.* at ¶ 3. After the gun was discharged, "the situation changed and the occupants of the apartment rose up against the intruders, disarmed appellant," and held appellant and the co-defendant until police officers arrived. *Id.*

{¶ 98} At the time of his arrest, appellant had a blue latex glove on one hand, and police investigators recovered a loaded Ruger handgun and a black ski mask at the scene. As noted by the trial court, appellant's "DNA was recovered from the ski mask and the gun found at the scene." (July 19, 2017 Decision at 12.)

{¶ 99} The state's evidence included the testimony of nine eyewitnesses to the events and, as previously indicated, the same judge presided over the trial and the post-conviction proceedings. The trial court recalled observing the state's witnesses, and "that they provided credible evidence establishing [appellant's] guilt"; further, that appellant "testified at trial, and the jury rejected his testimony." (July 19, 2017 Decision at 12.) The trial court, noting that the state presented 14 witnesses at trial, and that each witness was cross-examined by two defense attorneys, found the testimony and evidence against appellant to be "consistent and overwhelming." (July 19, 2017 Decision on Post-Trial Mot. at 3.) The trial court further determined appellant "failed to establish a reasonable probability of a different outcome if counsel had investigated or subpoenaed [appellant's] brother or * * * Aboke, or questioned witnesses about [appellant's] present assertions [regarding] alleged extortion and 'victims' stat[ing] no robbery occurred." (July 19, 2017 Decision at 13.) On review, we agree with the trial court's conclusion that appellant failed to demonstrate prejudice under the second prong of *Strickland*.

{¶ 100} Finally, we find no merit to appellant's contention (raised under his fourth assignment of error) that the trial court erred in refusing to expand the scope of the post-

conviction hearing into issues regarding defendant's exhibit No. 15 (the purported jail visitor list). As previously noted, the evidence at the hearing established the exhibit at issue was a prison document obtained by appellant after his trial and conviction. Here, the trial court did not err in quashing two subpoenas on the basis that the information sought was not relevant to the issue of trial counsel's pretrial investigation.

{¶ 101} Accordingly, the trial court did not err in denying appellant's petition for post-conviction relief. Further, we find no error by the trial court in denying the motion for new trial, which incorporated arguments raised by appellant in the post-conviction petition related to claims of ineffective assistance of counsel and based on the evidence developed during the remand hearing.

{¶ 102} Based on the foregoing, appellant's four assignments of error are not well-taken and are overruled. Accordingly, having overruled all of appellant's assignments of error, the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN, J., concurs.
BRUNNER, J., dissents.

BRUNNER, J., dissenting.

{¶ 103} I respectfully dissent from the decision of the majority and would reverse the trial court's decision and order a new trial.

{¶ 104} Defendant-appellant, Mohamed A. Ibrahim, appeals a July 17, 2017 judgment of the Franklin County Court of Common Pleas denying his motion for a new trial, denying his petition for postconviction relief, and adopting findings of fact and conclusions of law submitted by the plaintiff-appellee, State of Ohio. I would hold that the trial court abused its discretion in crediting an explanation by defense counsel that counsel's failure to investigate the case was caused by Ibrahim's refusal to relate his side of the story and thereby pique the need to investigate. Defense counsel's contention that Ibrahim never shared his version of events is contradicted by the fact that during the trial, counsel set forth Ibrahim's version of events in considerable detail, using no other source of evidence than Ibrahim's testimony.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 105}  On January 31, 2012, a Franklin County Grand Jury indicted Ibrahim and a co-defendant, Mohamed Noor, charging them with 1 count of burglary and numerous counts of kidnapping, aggravated robbery, robbery, and felonious assault arising from an alleged single home invasion in which he and Noor allegedly terrorized and robbed 11 people.  (Jan. 31, 2012 Indictment.)  Ibrahim pled "not guilty" and ultimately was tried and convicted by a jury on 25 counts, each with an accompanying firearm specification.  (Feb. 3, 2012 Plea Form; Feb. 1, 2013 Verdict Forms.)  Specifically, Ibrahim was convicted of 1 count of aggravated burglary, 2 counts of felonious assault, 11 counts of kidnapping, and 11 counts of aggravated robbery.  (Feb. 1, 2013 Verdict Forms.)

{¶ 106}  This court has previously summarized the underlying facts of the case as follows:

> [The] alleged crimes arose out of an incident that occurred at the apartment home of Farheyo Abdulkar ("Abdulkar") on January 21, 2012, on Eakin Road in Columbus, Ohio. All of the people present at the apartment, as well as [Noor] and [Ibrahim], were immigrants to the United States from their country of origin, Somalia.
>
> The state's theory of the case was that [Noor] and Ibrahim intruded into Abdulkar's apartment where 11 people had gathered to watch a Somali television program transmitted via the Internet. [Noor] and Ibrahim, one of whom had a gun, demanded money and property from the occupants. During the incident, which lasted approximately 20 to 40 minutes, one of the occupants of the apartment was shot while another was injured as the result of being struck on the head with the gun. Ultimately, a fight ensued, and [Noor] and Ibrahim were overcome by the individuals at the apartment. Both [Noor] and Ibrahim were injured during the fight. Two of the occupants, including the gunshot victim, escaped the scene and called 911 from a neighbor's residence. Police arrived shortly thereafter and found [Noor] and Ibrahim inside the apartment, injured and subdued. Both [Noor] and Ibrahim received hospital treatment after the incident, as did the victim of the gunshot wound and the individual who had been injured when struck with the gun.
>
> The defense argued that [Noor] and Ibrahim went to the apartment because Ibrahim intended to purchase khat. Khat is a substance classified as an illegal drug in Ohio but which is

> reputedly commonly used in the Somali community. Ibrahim testified that a dispute broke out during the drug transaction which escalated into the fight. The defense suggested that the 11 individuals in the apartment colluded to develop the false robbery story in order to conceal their own illegal drug activities.

(Footnote omitted.) *State v. Noor*, 10th Dist. No. 13AP-165, 2014-Ohio-3397, ¶ 2-4. For his role in this offense, Ibrahim was sentenced to 57 years in prison. (Feb. 5, 2013 Jgmt. Entry at 2.)

{¶ 107} Ibrahim appealed and, on February 25, 2014, we issued a decision affirming his convictions. *State v. Ibrahim*, 10th Dist. No. 13AP-167, 2014-Ohio-666.

{¶ 108} In November 2013, while the direct appeal was pending, Ibrahim filed a motion for postconviction relief. (Nov. 14, 2013 Post-Conviction Petition; Nov. 12, 2013 Post Conviction Supplement.) The trial court denied the petition without a hearing on April 1, 2014. (Apr. 1, 2014 Decision.) On appeal, this Court noted that the petition raised the following grounds for relief:

- Ineffective assistance of trial counsel:

  o For failure to investigate and adequately prepare for trial;

  o For failure to subpoena key witnesses to testify on appellant's behalf;

  o For failure to inform appellant sufficiently to enable him to assist in his own defense;

  o For failures relating to the use of an interpreter at trial:

    ▪ Failure to preserve the record of translation;

    ▪ Failure to request interpreter's qualifications be established on the record;

    ▪ Failure to question the availability of a certified interpreter;

    ▪ Failure to object to less than a word-for-word translation;

- Failure to request that the interpreter be sworn in on the record.

  o Failure to argue self-defense or to request a self-defense instruction;

  o Failure to adequately present or develop significant evidence at trial;

  o Failure to investigate, evaluate and present evidence of mitigating circumstances with respect to appellant's sentencing;

  o Failure to object to appellant's conviction of both aggravated robbery and kidnapping and failure to object to non-merger of the same.

- Cumulative error and effect.

- Ineffective assistance of appellate counsel:

  o For failure to raise on appeal ineffective assistance of trial counsel for failures relating to the use of an interpreter at trial;

  o For failure to raise on appeal ineffective assistance of trial counsel for failure to request severance of trial for Ibrahim from Noor or to ask for a mistrial when Noor's counsel shifted the blame for the criminal activity to appellant;

  o For failure to raise on appeal ineffective assistance of trial counsel for failure to object to appellant's conviction of both aggravated robbery and kidnapping and failure to object to non-merger of the same.

(Footnote omitted.) *State v. Ibrahim*, 10th Dist. No. 14AP-355, 2014-Ohio-5307, ¶ 5. That panel found that many of these arguments had not been sufficiently supported to deserve a hearing and that some should have been raised on direct appeal and were barred by res judicata. *Id.* at ¶ 10-25, 34-35. Thus, this Court affirmed in part, Ibrahim never appealed the affirmed rulings further, and the case was not further reviewed. *State v. Ibrahim*, 143 Ohio St.3d 1499, 2015-Ohio-4468 (declining jurisdiction). However, the panel's decision

also reversed in part and remanded for the trial court to hold a hearing on three averments of affidavits supporting Ibrahim's petition:

- That alleged victim Abdi Mohamed bragged that a robbery did not occur ([as averred by Ibrahim, Aweis Ibrahim, Amina Manguera, and Mowlina Aboke])

- That another prosecuting witnesses stated that a robbery did not occur (Manguera)

- That the prosecuting witnesses attempted to extort $10,000 from appellant's family in exchange for their silence at the trial (Manguera, Aweis, Mowlina)

*Ibrahim*, 2014-Ohio-5307, at ¶ 26. Our decision also noted that a purported jail visitor list appeared to show that two of the victims, Farheyo Abdulkar and Abdi Aden had attempted to visit Ibrahim in jail, which the panel considered to be potentially consistent with claims that the prosecuting witnesses were engaged in an extortion attempt. *Id.* at ¶ 30. The panel also particularly noted that Ibrahim had failed to attach an affidavit from his counsel to support the claims that counsel failed to investigate the issues in the case. *Id.* at ¶ 19.

{¶ 109} On remand, the trial court held a hearing on October 4, 2016. At that hearing, Aweis Ibrahim (Mohamed Ibrahim's brother) and Mowlina Aboke (a barber who overheard statements by the victims) testified.

{¶ 110} Aweis[2] testified that the apartment where the events occurred, 3740 Eakin Road, apartment 11, is a place where people from the community gather to chew khat, eat, and socialize. (Oct. 4, 2016 Hearing Tr. at 12-13, filed Feb. 21, 2017.) He explained that the apartment's proprietor, Farheyo Abdulkar, was keen to make sure no one found out about the true purpose of the lodging. *Id.* at 22-23. According to Aweis, another victim, whose full name was Abdul Kadir Aden, approached Ibrahim's family offering silence at Ibrahim's trial in exchange for $10,000. *Id.* at 19-20, 24-25. Aweis also said that another victim, Abdi Mohamed, had gotten into a physical fight with his brother earlier on the same day as the incident. *Id.* at 17-18. Aweis said he attempted to contact Ibrahim's attorney with this information by telephone and in-person office visits on several occasions, but was

---

[2] Because several of the people involved in this case have either a surname or first name in common with others, we shall endeavor to use whatever part of their name best identifies them to the exclusion of others. We intend no lack of formality by this practice.

unsuccessful and the attorney never returned any of his messages. *Id.* at 21-22. However, Aweis admitted that he visited his brother in jail on several occasions while the case was ongoing and also attended court dates on two occasions. *Id.* at 36-41. Despite this, he never spoke to Ibrahim or his attorney about these matters while the case was ongoing, nor did he contact the police or anyone else regarding the matter. *Id.* at 47-48, 56.

{¶ 111} Mowlina Aboke relayed that he was the proprietor of a barbershop and of no relation to Ibrahim. *Id.* at 62-64. He recalled that Abdi Mohamed (one of the victims) came into his barbershop approximately one week after the incident in the apartment at 3740 Eakin Road and was talking about it. *Id.* at 64-66. Mowlina said Abdi Mohamed initially related that there had been a robbery but, because his speech was jerky, Mowlina did not believe him. *Id.* at 66. Abdi Mohamed ultimately talked further about the events and, according to Mowlina, admitted there had been no robbery and that he made it up because he thought Ibrahim might be a drug informant and he wanted revenge for a fight he had with Ibrahim some ten days before the alleged robbery. *Id.* at 66-68. Mowlina also related that he was aware that there had been an attempt to extort $10,000 from Ibrahim's family. *Id.* at 74, 84, 88. Mowlina admitted, however, that he never came forward with this information, feared retribution, and had not wanted to become involved. *Id.* at 72-73, 91-92. He said the only person he spoke to about these matters when he found out about them was Aweis. *Id.* at 77-78.

{¶ 112} In the next hearing, on March 6, 2017, Amina Manguera (who is the maternal aunt of Ibrahim) testified. (Mar. 6, 2017 Hearing Tr. at 5, filed Aug. 4, 2017.) She essentially repudiated her entire affidavit and claimed to have no useful information to offer. *Id.* at 11-17. She denied having been threatened and denied even knowing anyone involved in the robbery. *Id.* at 19.

{¶ 113} In the same hearing, Ibrahim's trial counsel testified. *Id.* at 30. He testified that no one approached him with any information suggesting victims were recanting or engaged in an extortion plot either during the time of trial or the entire year in which he represented Ibrahim prior to trial. *Id.* at 35-38. He also did not receive any messages to indicate that Aweis, Mowlina, or Manguera had attempted to contact him. *Id.* at 40-42. He testified that he received full discovery from the State and visited Ibrahim in jail on eight occasions to discuss the case with him. *Id.* at 42-46. Ibrahim, he said, refused to discuss

the case except to say that the prosecuting witnesses were not going to appear for trial and thus there was no need to worry. *Id.* at 46-48, 90-91, 94-98. Ibrahim, he claimed, did not communicate about the case. *Id.* at 51-52. As examples, Ibrahim's attorney related that Ibrahim did not tell him that one of the alleged victims was his uncle or that he had previously had a fight with one of the victims until during trial when those persons were on the witness stand. *Id.*

{¶ 114} Ibraham's attorney admitted, however, that he did not request an investigator, never went to the scene, never interviewed anyone from the neighborhood, and never interviewed the victims (though Noor's counsel did interview the victims and shared the information he obtained). *Id.* at 64-69, 77-79, 90-91. Ibrahim's attorney stated that his client never gave him any ideas on what to investigate and that he did not feel that, without a specific investigative goal, he could have credibly asked the trial judge for funds for an investigator. *Id.* at 64-66, 79, 94-95. Ibrahim's attorney also admitted that he received a serious medical diagnosis approximately 6 months following Ibrahim's trial and that he was handling approximately 120 cases per year, but denied that his health or busy schedule impacted his representation of Ibrahim. *Id.* at 49-52, 94-95. He testified that his medical condition did, however, prevent him from providing an affidavit for Ibrahim's current counsel in time for the first postconviction effort and subsequent appeal. *Id.* at 63.

{¶ 115} Ibrahim testified also in the March hearing. He admitted that he told his trial attorney that he thought the prosecuting witnesses would not come to court but denied telling Ibrahim's attorney not to worry about investigating or preparing the case. *Id.* at 109-11. Rather, he testified that he reviewed the discovery materials with his attorney and told his side of the story—that he went to the apartment to buy khat and a fight ensued. *Id.* at 111-13. Ibrahim said he told his attorney that the victims were lying about there having been a robbery in order to frame him and shield their drug activities from discovery. *Id.* at 127. No one, he said, informed him of the extortion attempt until after trial. *Id.* at 132. He testified that the visitor list, which a panel of this Court mentioned in a prior decision, was a prison document and therefore concerned his visitations after the time of trial. *Id.* at 151-52. He admitted that none of the victims in the case ever actually visited him at either the jail or the prison but said he was unsure whether or not they tried to. *Id.* at 152-54.

{¶ 116} Between the March hearing and a final hearing in May 2017, in light of Ibrahim's attorney's admission that he did not independently investigate the case, Ibrahim filed a motion for a new trial (and an accompanying motion for leave to file) requesting a new trial on the ground that his counsel had entirely failed to investigate his case and substantially failed to prepare for trial. (May 12, 2017 Mot. for Leave to File a Mot. for New Trial.) The State also filed, and the trial court granted, a motion to quash subpoenas for Farheyo Abdulkar and Abdi Aden who were on the prison visitor list for Ibrahim. (Apr. 27, 2017 Mot. to Quash; May 5, 2017 Decision.)

{¶ 117} At the final hearing, on May 22, 2017, an attorney from the Ohio Department of Rehabilitation and Correction ("ODRC") testified. He explained that the visitor list referred to in our prior decision is a prison document which lists individuals about whom ODRC has relevant visitation information. (May 22, 2017 Hearing Tr. at 13, filed Nov. 21, 2017.) It is not a log of people who actually visited or people who tried to visit. *Id.* at 13-14. Names can be added to that list at the prisoner's request, at the potential visitors' request, or by ODRC personnel who review the case. *Id.* at 14-15. The attorney could not say why Abdi Aden and Farheyo Abdulkar's names were on the visitation list but stated that they were designated "restricted" and not permitted to visit. *Id.* at 15, 28-29; State's Hearing Ex. B, filed Nov. 8, 2017. He also noted that two other ODRC documents show that they never visited and are not listed as having applied to visit. (May 22, 2017 Hearing Tr. at 18-20, 22-23; State's Hearing Exs. C-D, filed Nov. 8, 2017.) He admitted, however, the documents contained some inaccuracies in that some persons who actually visited Ibrahim (such as Aweis and a person named Luuley Mohamed) were not listed as having applied to visit despite the fact that they actually visited and therefore must have applied to visit. (May 22, 2017 Hearing Tr. at 39-40.) A*lso compare* State's Hearing Ex. C *with* State's Hearing Ex. D.

{¶ 118} Ibrahim also testified in the May hearing. He explained that he did not know why Abdi Aden's and Farheyo Abdulkar's names were on the visitation list but stated that they did not actually visit him and that he did not ask for their names to be added to the visitation list. (May 22, 2017 Hearing Tr. at 46-47.)

{¶ 119} On July 17, 2017, the trial court denied the motion for a new trial and the petition for postconviction relief. (July 17, 2017 Decision.) It reasoned that one of the three

witnesses in support of the postconviction petition disavowed all knowledge of the case, one offered only hearsay by a victim, and another was not credible because he failed to tell his own brother of the alleged extortion attempts and a victim's admission that no robbery had occurred. *Id.* at 1-2. The court found that the visitation list was not pertinent because the list was a prison document prepared after trial and, to the extent it contained victims' names, it actually was a list of persons who were not permitted to visit. *Id.* at 2. The trial court found that trial counsel had met with Ibrahim an "adequate number of times," that Ibrahim had failed to cooperate in his own defense, and that, given the volume of witnesses against Ibrahim, "[n]othing the trial counsel could have done would have changed the results, anyway." *Id.* at 3. It adopted the State's findings of fact and conclusions of law and released those in a decision and entry two days later. (July 19, 2017 Findings of Fact & Conclusions of Law.)

{¶ 120} Of Ibrahim's four assignments of error in this appeal, I would sustain the first assignment of error, making moot the remaining three assignments of error.

## A. Standards of Review

### 1. Postconviction Standard

{¶ 121} The postconviction relief process is a collateral civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994). "It is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained" in the trial court record. *State v. Murphy*, 10th Dist. No. 00AP-233, 2000 WL 1877526, 2000 Ohio App. LEXIS 6129, *5 (Dec. 26, 2000); *see also, e.g.*, *State v. Carter*, 10th Dist. No. 13AP-4, 2013-Ohio-4058, ¶ 15. In general, a trial court's finding on a petition for postconviction relief is reviewed for abuse of discretion. *State v. Jones*, 10th Dist. No. 16AP-128, 2017-Ohio-1121, ¶ 12. "Further, 'when a trial court rules on a postconviction petition after a hearing, a reviewing court must give deference to the trial court's findings of fact.' " *State v. Small*, 10th Dist. No. 01AP-1007, 2002-Ohio-3320, ¶ 9, quoting *State v. Mullins*, 10th Dist. No. 96APA01-32, 1996 WL 362073, 1996 Ohio App. LEXIS 2759, *7 (June 25, 1996).

### 2. Standard of Review for Motion for a New Trial

{¶ 122} Ohio Rule of Criminal Procedure 33(A)(6) sets forth the bases for obtaining a new trial in relevant part as follows:

> (A) **Grounds.** A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
>
> * * *
>
> (6) When new evidence material to the defense is discovered * * *.

Newly discovered evidence for purposes of Crim.R. 33 is evidence "which the defendant could not with reasonable diligence have discovered and produced at the trial." Crim.R. 33(A)(6). Here the purportedly new evidence is the admission by Ibrahim's counsel (which would not have been relevant or admissible during trial) that he failed to investigate Ibrahim's case.

{¶ 123} The Rule also sets forth the timing for motions for new trials:

> (B) **Motion for new trial; Form, Time.** * * *
>
> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Crim.R. 33(B). The jury returned guilty verdicts in Ibrahim's case on February 1, 2013. (Feb. 1, 2013 Verdict Forms; Tr. Vol. 4 at 866-77.) As Ibrahim did not attempt to file a motion for a new trial until May 2017, he is well beyond the 120-day time limit set forth in Crim.R. 33. (May 1, 2017 Mot. for New Trial; May 12, 2017 Mot. for Leave & Mot. for New Trial.) Yet, the trial court granted leave and the State has not appealed that ruling. *See* July 17, 2017 Decision at 3 (remarking that the court would consider the merits of Ibrahim's motion for a new trial "despite the state's contention that the motion is untimely").

{¶ 124} Thus, the question for this Court is whether the trial court properly denied Ibrahim's motion for a new trial on the merits, according to an abuse of discretion standard. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 82; *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus.

**B. First Assignment of Error – Whether Trial Counsel Provided Ineffective Assistance of Counsel in Failing to Investigate**

{¶ 125} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* One example of deficient performance is an unreasonable failure to investigate. "It is axiomatic that effective representation of a client carries with it a burden to investigate. '* * * [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *State v. Bradley*, 42 Ohio St.3d 136, 146 (1989), quoting *Strickland* at 691. In other words, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[,]" but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland* at 690-91. " 'To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *Bradley* at paragraph three of the syllabus.

{¶ 126} Ibrahim's trial counsel testified that, although he received discovery from the State and reviewed it, he did essentially no investigation of Ibrahim's case. (Mar. 6, 2017 Hearing Tr. at 42-46, 64-70, 90-91.) He did not visit the neighborhood or speak to people in the neighborhood about whether apartment 11 was a hangout for khat chewing. *Id.* at 68-69. He did not view the scene or attempt to ascertain if any nearby cameras may have caught relevant activity. *Id.* at 69. Nor did he hire an investigator or ask the court for funds for an investigator who could have done any of those things for him. *Id.* at 64-66, 79. He did not even talk to or attempt to talk to victim-witnesses whose names were known to him because, "[i]t just so happened that the day that [he and Noor's counsel] were going to go, [he] had something else [he] had to do." *Id.* at 46-48, 77-78. He therefore decided to simply rely on the report of Noor's counsel who did interview the State's witnesses. *Id.*

{¶ 127} To support his decision not to investigate, Ibrahim's attorney testified that Ibrahim gave him nothing to investigate and had refused to discuss the case except to say

that the prosecuting witnesses would not show up for trial.  For example, he testified as follows:

> Q. [W]as there a recurring theme to those discussions and meetings with Mr. Ibrahim?
>
> A. Yes.
>
> Q. What was the recurring theme with him?
>
> A. That these -- that the victims weren't coming.
>
> Q. Go into a little more detail with that.
>
> A. I would go out, and I would say to him, you know, that we need to come up with a defense, what went on. And he just would tell me, "Don't worry, Mr. [Ibraham's attorney]. These people aren't coming."
>
> Q. Okay. Then what?
>
> A. I would -- usually when we come to court, I'd talk to you about, "Hey, you know, my client doesn't believe that these people are coming. Do you have these people?" That went on for quite sometime[sic].
>
> And I think in the fall -- I can't remember exactly what month -- [Noor's counsel] and I were going to go out and actually talk to the victims. It just so happened that the day that we were going to go, I had something else I had to do. So [Noor's counsel] went out and talked to the victims, and he told me that he was going to come back and tell me what they said.
>
> Q. All right. Did he have that meeting?
>
> A. Yes, he did.
>
> Q. Did he relay that information to you?
>
> A. Yes.
>
> * * *
>
> Q. Based on that, what did you do?
>
> A. I went out and talked to Mr. Ibrahim again, telling him, "Hey, you know, my understanding is these people are coming

and they're saying the same things that was in the police reports."

Q. How did he respond to that?

A. He just told me they weren't coming.

Q. So that was his basic defense, these folks aren't coming?

A. Right.

* * *

Q. * * * Why wasn't an investigator assigned to the case to obtain security footage from cameras in front and back of the apartment?

A. There wasn't any investigator assigned because my client kept telling me that these people weren't coming.

Q. So you as the professional decided you didn't need it. You go to a trial hoping that they don't show up?

A. Me as a professional kept going out to my client, asking him, almost begging him, to tell me what was going on with this case.

Q. Well - -

A. And he never would tell me anything, sir.

* * *

Q. Did you ever go to the judge and say, "Judge, I think it's best he get a different lawyer 'cause I'm not -- we're not working together very well?"

A. No, actually I thought we were working very well. Like, as I testified to earlier, he was very nice. He was very cordial. And he would say, you know, "Mr. [Ibraham's attorney], don't worry about it. These people aren't coming." And that -- you know, and I'd try to talk to him about things and try to tell him the consequences. But we communicated. It's just that he kept telling me that these people weren't coming, and he wouldn't tell me how he knew that.

Q. So you came to this courtroom -- if I understand correctly, you came to this courtroom on the day of trial having absolutely no defense prepared other than they're not going to show up.

You didn't have any subpoenas out as you indicated already. You didn't go to the scene. You didn't interview anybody. You just came to court -- to this courtroom, to this judge, not prepared other than what your client had told you; is that what you're telling us?

A. Yeah. I was prepared with what my client gave me.

Q. Well, which was they're not going to show up.

A. Yeah.

* * *

Q. [T]he attorney should do an investigation, would you agree with that?

A. If there's an investigation to be had, yes.

Q. Yeah. And you're saying there wasn't one in this case?

A. I'm saying that he never gave me anything to investigate.

(Mar. 6, 2017 Hearing Tr. at 46-48, 79, 90-91, 95.)

{¶ 128} The trial court credited this explanation. Specifically, it found:

The defendant says his trial counsel was incompetent because he failed to prepare, i.e. did not request an investigator, did no investigation of his own, failed to call any outside witnesses and so forth. The trial counsel testified in this proceeding and said he did all he could with an uncooperative client.

The court agrees. Counsel met with the defendant an adequate number of times at the jail and continuously attempted to discuss witnesses and issues. The defendant would only say the witnesses are not going to show up.

(July 17, 2017 Decision at 3.)

{¶ 129} The trial transcript in this case makes it abundantly apparent that Ibrahim told his trial counsel more than the statement that prosecution witnesses would not show up to trial—he told his attorney his side of the story—that this was not a robbery but a drug argument that turned into a fight and a frame-up. For example, in opening statement, before any evidence was presented and before Ibrahim testified, Ibrahim's attorney presented to the jury Ibrahim's version of events:

There's no dispute there was an incident that happened at 3740 Eakin Road a year ago. I think you heard yesterday it was a year, now it will be two days ago. But the circumstances and what happened during this incident are different between what the State says and what the Defense believes that the evidence will show.

* * *

On January 21st of last year, Mohamed Ibrahim, my client, got a phone call from his uncle, and his uncle wanted something called khat. And I think you heard in the voir dire that khat is basically a drug, illegal drug, that comes from Africa, runs the Somali/Ethiopian area, and it's a drug that the indigenous people chew, and they get whatever sensations they want out of that from that drug.

* * *

So, Mohamed Ibrahim went to a place where he bought khat before, and that's the address, 3740 Eakin Road. He's been there before. He's bought drugs before, and there was people in there. And when he got there, there was all kinds of people outside the apartment building. There was people going down the stairs, and there was -- the apartment was filled. And I think there's, like, three levels in the apartment building.

* * *

* * * And when he got -- Mohamed Ibrahim went inside, he saw a lot of people in the inside. He saw that they were also actually sitting there doing khat, not just watching TV, but also doing khat, chewing it, you know, getting high, doing whatever other things they were doing there.

And they started bickering about the price. And Mohamed Ibrahim realized that there were some people that were in this apartment that he knew from the streets, and there was already bad blood from them.

So, when he first got there, the price of the drugs that they wanted -- were going to get were a certain price. And then these other people interjected, well, you got to charge him more, you got to charge him more. The price got jacked up. Mr. Ibrahim couldn't buy the drugs that he wanted, what he came there for and what he was originally told the amount was going to be, and a verbal argument started.

> That argument ended up becoming a physical argument; and in that argument, a baseball bat came out. Mr. Ibrahim was hit in the head. He was actually knocked out until the police got there. I think the evidence will also show that Mr. Noor never actually entered the apartment until -- until the fight started 'cause he wanted to try to help Mr. Ibrahim.
>
> Now, one of the issues you heard about was burglary, and they're talking about trespassing into a residence. In this case, actually Mr. Ibrahim was invited in to buy some drugs. There was a fight in there. You'll see -- the State was talking about two counts of felonious assault where you'll see some pictures of Mr. Ibrahim where he was actually -- there's a felonious assault that was performed on him. A lot of blood. A lot of blood in the apartment that you'll see is from Mr. Ibrahim. And then also Mr. Noor got beat up also.
>
> And then there's the thing about the robbery. We believe that you'll have information that during this fight, all of a sudden Mr. Ibrahim's shoes came up missing. His wallet came up missing. And the next thing he remembered when he came to, the police were actually standing over top of him.
>
> So, a lot of things could happen. One of the things I think you heard -- you'll hear about -- about this issue about the gun, you'll actually need to listen about this gun, whose DNA was on the gun, and what kind of tests were done on the gun, and listen very carefully; and hopefully we believe that once you hear all the evidence that you'll see that Mr. Ibrahim is not guilty of any of these charges.

(Tr. Vol. 1 at 25-28.)  Ibrahim thereafter testified at trial consistently with his attorney's opening statement, and his attorney reiterated the facts of his opening statement in closing. (Tr. Vol. 4 at 668-98, 767-79.)  We even noted, in some of our prior decisions related to this case, that the defense theory at trial was that this had not been a robbery but a "drug transaction which escalated into the fight," *Noor*, 2014-Ohio-3397, at ¶ 4, followed by collusion among the people in the apartment to "develop the false robbery story in order to conceal their own illegal drug activities." *Id.*

{¶ 130}  Ibrahim's attorney's own words at trial show that his testimony in the postconviction hearing to the effect that Ibrahim never gave him an alternative narrative to investigate, cannot be the case.  And the trial court, which had the benefit of hearing the entire trial and of receiving our decisions noting the deficits of the defense's claimed

approach to trial, apparently did not find problems with Ibrahim's attorney's testimony when he said he had not been provided with an alternative narrative to investigate. It was unreasonable for the trial court to have relied on the attorney's assertion that Ibrahim gave him nothing to investigate. Ibrahim's attorney knew Ibrahim's alternative explanation even before the start of trial and, by his own testimony, he did nothing to investigate it or attempt to corroborate it. The Constitution requires more from a criminal defense attorney than that. *Strickland*, 466 U.S. at 691; *Bradley*, 42 Ohio St.3d at 146.

{¶ 131} At trial, there were numerous witnesses who testified that Ibrahim and Noor robbed the people inside 3740 Eakin Road on January 21, 2012. (July 17, 2017 Decision at 3.) Each of those witnesses also testified, however, that they were at Eakin Road to watch television, not to buy, sell, or use drugs. (Tr. Vol. 1 at 178-80, 204; Tr. Vol. 2 at 274, 308-09, 331, 380, 405, 437; Tr. Vol. 3 at 529, 571, 591, 620-21.) One detective who testified at trial admitted that one of the two victims who did not testify told the police that he was chewing garabo (a form of khat) in the apartment at the time of the robbery. (Tr. Vol. 4 at 708.) No one else who testified at trial supported Ibrahim's version of events that this was an escalation of an argument over drugs.

{¶ 132} Yet, in postconviction proceedings, even though years had passed since the events in January 2012, investigation yielded more information. Aweis Ibrahim testified in the postconviction hearing in October 2016 that 3740 Eakin Road was the place where people from the Somali community went to chew khat and socialize. (Oct. 4, 2016 Hearing Tr. at 12-13.) Mowlina Aboke, a local barber with no relationship to Ibrahim, testified during the postconviction hearing that he was scared of the victim-witnesses, that they were like the mafia, and that he had heard from Abdi Mohamed, who was at 3740 Eakin Road on January 21, 2012, that charges against Ibrahim were a fabrication to cover-up drug activities. *Id.* at 62-63, 73-74. The trial court dismissed Aboke's testimony as hearsay. (July 17, 2017 Decision at 1-2.) But Abdi Mohamed, the person who told Aboke about the conspiracy did not testify at trial. If he was unavailable, then an admission to framing someone to cover up a drug deal would have been a statement against penal interest. Evid.R. 804(B)(5). If he were available and counsel had investigated appropriately then, as we noted in our previous opinion, "[c]ounsel [] could have subpoenaed Abdi Mohammed and examined him. Such cross-examination * * * could have been damaging to the

credibility of all the witnesses." *Ibrahim*, 2014-Ohio-5307, at ¶ 31. Although by the time of the postconviction proceeding, Amina Manguera was repudiating her affidavit, her affidavit asserted that her ex-husband was one of the managers of the drug business in question. (Ex. 2 attached to Nov. 14, 2013 Post Conviction Petition.)

{¶ 133} Would the jury have still believed the testifying victims' version of events if witnesses besides Ibrahim had testified at trial? How would the jury have adjudged evidence that 3740 Eakin Road was a drug den run by a Somali clan that operates like the mafia, not a gathering of 11 unrelated friends watching TV? Would that evidence and more have been presented if Ibrahim's counsel had engaged in any independent investigation at the time of the original trial? It is impossible to say for certain at this juncture. Nonetheless, there is a "reasonable probability" that the jury would have seen things differently if counsel had investigated to the degree required by the Constitution. *Strickland*, 466 U.S. at 694; *Bradley*, 42 Ohio St.3d at paragraph three of the syllabus; *Griffin*, 2011-Ohio-4250, at ¶ 42. I would sustain Ibrahim's first assignment of error and remand for a new trial.

### C. Second, Third, and Fourth Assignments of Error – Moot

{¶ 134} Having determined to reverse and remand for a new trial based on the first assignment of error, I would find the remaining assignments are moot and considered no further.

## II. CONCLUSION

{¶ 135} Defense counsel admitted failing to engage in any independent investigation of Ibrahim's case but attributed this failure to be due to Ibrahim's refusal to tell him anything about the case except that the prosecution witnesses would not appear for trial. Counsel's assertion that Ibrahim did not communicate to him Ibrahim's side of the story was contradicted by the trial transcript in which defense counsel's opening and closing statements both explained Ibrahim's version of events in great detail—that this was not a robbery but an argument over drugs which escalated into a fight. Given the fact that the trial judge was present for the trial and received prior decisions from this Court that Ibrahim's version of events had been presented at trial—in opening and closing by his attorney and through Ibrahim's testimony, the trial court's decision to credit defense counsel's excuse for not investigating, respectfully, amounts to an abuse of discretion. Thus, I would sustain Ibrahim's first assignment of error, reverse the trial court's judgment

on Ibrahim's motion for postconviction relief and remand for a new trial, and find his remaining three assignments of error moot and considered no further.

{¶ 136} Therefore, I respectfully dissent from the majority decision.

_____